In re the MARRIAGE OF Keely
SALMON and Christopher
R. Salmon.

Upon the Petition of Keely
Salmon, Appellant,

And Concerning Christopher
R. Salmon, Appellee.

No. 93–1105.

Court of Appeals of Iowa.

April 26, 1994.

R.L. Sole of Glasson, Grove, Sole & Mc-
Manus, P.C., Cedar Rapids, for appellant.

Webb L. Wassmer and Matthew J. Pe-
trzelka of Simmons, Perrine, Albright & Ell-
wood, Cedar Rapids, for appellee.

Considered by DONIELSON, P.J., and
HABHAB and CADY, JJ.

CADY, Judge.

Christopher and Keely Salmon were di-
vorced on August 30, 1985. Pursuant to the
dissolution decree, Keely was awarded sole
care and custody of the parties' two minor
children. Christopher was granted visitation
every other weekend between the hours of 9
a.m. and 5 p.m. on Saturday and Sunday.
He was also granted visitation one evening
each week until 8 p.m. Christopher was
ordered to pay $100 per week in child sup-
port, to be reduced to $75 per week when the
oldest child turned eighteen years of age.

The decree included provisions for health insurance and medical expenses.

During the parties' marriage, Christopher was arrested approximately thirty times for various acts of deviant sexual behavior, specifically voyeurism. Christopher also had a history of alcohol and drug abuse. Christopher testified that the voyeuristic activities continued until June 1988, when he was jailed for two days following an arrest for voyeurism. In 1989 Christopher moved to Chicago. He is now working as a commercial artist, earning net wages of $1050 per month. Christopher currently lives with two other men.

Keely remarried in 1988. She has two children from this marriage. Keely is a registered nurse and works one to two days per month at St. Luke's Hospital in Cedar Rapids. She is paid an hourly wage of $14.

On April 16, 1992, Christopher filed an application for modification of the decree, alleging a substantial change in circumstances. Christopher requested that he be granted joint custody and unsupervised weekend visitations in Chicago. Christopher claimed he was totally rehabilitated. Keely resisted the application, arguing there was no evidence that Christopher, despite his assertions to the contrary, had stopped his deviant behavior. Keely also expressed doubts about Christopher's alleged drug rehabilitation, and was concerned about a potential homosexual relationship between Christopher and one of his friends.

The district court modified the decree, providing for visitation during the third weekend of each month commencing in June 1993. Beginning January 1, 1994 the modified decree permitted the monthly visitations to alternate between Cedar Rapids and Chicago, allowing Christopher overnight visitation in Chicago every other month. The decree also granted him visitation for two weeks each summer. The district court additionally lowered Christopher's child support obligation to $315 per month, and ordered him to pay $75 per month to help cover the children's medical insurance premiums paid by Keely. The district court continued to decline a joint custody arrangement.

Keely appeals. She argues that it is not in the children's best interest to have unsupervised visitation in Chicago. She asserts there is no independent evidence supporting Christopher's claims that he no longer participates in deviant sexual behavior or uses alcohol and drugs. Keely also points to a letter Christopher sent to a friend indicating continued heavy drug use. Keely also points to the numerous psychological profiles indicating Christopher had antisocial tendencies going back over fifteen years. She notes further that the children have written Christopher indicating their displeasure in having to visit him in Chicago, especially while he is living with two other men.

Finally, Keely argues the district court erred in lowering Christopher's child support obligation. She contends the district court erred in estimating her income by taking her one-day-per-month wage at the hospital and turning it into a monthly income based on a forty-hour week.

## I. SCOPE OF REVIEW

■ Our review is de novo. Iowa R.App.P. 4. This requires us to examine the complete trial record and determine the issues presented anew unimpeded by the finding of the trial court. *In re Marriage of Steenhoek*, 305 N.W.2d 448, 452 (Iowa 1981). The findings of the trial court, however, are given weight, especially when considering credibility of witnesses. Iowa R.App.P. 14(f)(7). The trial court has the auspicious perspective of hearing the evidence and observing the witnesses. *In re Marriage of Will*, 489 N.W.2d 394, 397 (Iowa 1992). Thus, we recognize the reasonable discretion of the trial court to modify visitation rights and will not disturb its decision unless the record fairly shows it has failed to do equity. *Norenberg v. Norenberg*, 168 N.W.2d 794, 797 (Iowa 1969).

## II. MODIFICATION OF VISITATION

■ The parent seeking to modify child visitation provisions of a dissolution decree must establish by a preponderance of evidence that there has been a material change in circumstances since the decree and that the requested change in visitation is in the

best interests of the children. *See In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983). This standard follows the criteria used in actions to modify child custody, except a much less extensive change in circumstances is generally required in visitation cases. *In re Marriage of Jerome*, 378 N.W.2d 302, 305 (Iowa App.1985). The rationale for this lower standard is found in the prevailing principle that the best interests of children are ordinarily fostered by a continuing association with the noncustodial parent. *Donovan v. Donovan*, 212 N.W.2d 451, 453 (Iowa 1973); *see* Iowa Code § 598.41(1) (1993). When a noncustodial parent seeks to expand the visitation provisions provided in the original decree, the burden of proof rests with the parent seeking the enlarged visitation. *See Frederici*, 338 N.W.2d at 159; *Jerome*, 378 N.W.2d at 305; *see also In re Marriage of Tisckos*, 161 Ill.App.3d 302, 112 Ill.Dec. 860, 865, 514 N.E.2d 523, 528 (1987). Christopher bears the burden of proof in this case.

Keely and Christopher resided in the Cedar Rapids area at the time of their divorce in 1985. Their two daughters were four and two years old. The primary reason for limiting Christopher's visitation rights to daytime hours at the time of divorce was the fear that Christopher would leave the children alone at night to pursue his obsessive voyeuristic activities. His visitation rights had no further restrictions.

Christopher moved to Chicago following the entry of the decree. Modification of the visitation provisions of a decree is generally warranted when one parent moves from the state following a divorce. *See In re Marriage of Glass*, 213 N.W.2d 668, 670 (Iowa 1973). The distance created by the move usually renders the original visitation scheme impractical. This case is no exception. The fighting question, therefore, is whether overnight visitation is in the best interests of the children.

The children are now twelve and ten years old. They are unaware of Christopher's history of sexual deviancy and substance abuse. Although the children feel uneasy about visiting Christopher in Chicago, they want to maintain contact with him. Keely also wants the children to maintain a relationship with Christopher.

Christopher testified he has not committed any acts of voyeurism since 1988. He also testified he has not used drugs for several years and limits his consumption of alcohol. Kelly was suspicious of Christopher's testimony, but introduced no direct evidence to dispute it. Christopher has had no additions to his criminal record since 1988. He explained that the contents of the disputed letter were intended as a joke. Moreover, the most current psychological profiles and records on Christopher dated back to 1986.

Considering our deference to the trial court's ability to assess the credibility of the witnesses, we believe there has been a sufficient change in circumstances to modify visitation and that the modification is in the best interests of the children. We understand Keely's reluctance to allow overnight visits, but the evidence does not support a finding that the children will suffer physical or emotional harm by giving Christopher overnight visitation every other month, and two weeks during the summer. The preponderance of the evidence suggests that the circumstances which supported limited visitation at the time of the original decree are no longer present. Christopher should be given an opportunity to increase his contact and enhance his relationship with his children.

### III. CHILD SUPPORT

■ The district court is permitted to modify orders for child support when there is a substantial change in circumstances. *In re Marriage of Lee*, 486 N.W.2d 302, 304 (Iowa 1992). Many factors are considered in making this determination. Iowa Code section 598.21(8) (1993). Furthermore, a ten-percent deviation between the child support originally ordered and the child support calculated by the current uniform child support guidelines constitutes a substantial change in circumstances permitting modification of the child support obligation. Iowa Code § 598.-21(9).

Both parties agree that the percent variance standard under section 598.21(9) is applicable to this case. The question is wheth-

er Keely's earning capacity, rather than actual earnings, should be used in applying the guidelines.

■ It is appropriate to consider earning capacity rather than actual earnings in applying the uniform guidelines. *In re Marriage of Bonnette*, 492 N.W.2d 717, 722 (Iowa App. 1992). Each parent has a duty to provide support according to his or her ability to pay. *Iowa Dep't of Human Serv. ex rel. Gonzales v. Gable*, 474 N.W.2d 581, 582–83 (Iowa App. 1991). However, before using earning capacity rather than actual earnings, a finding must be made by the court that the use of actual earnings would create a substantial injustice or that adjustments would be necessary to provide for the needs of the children and to do justice between the parties. *Bonnette*, 492 N.W.2d at 722. The trial court made no such finding, and we are unable to do so on our review of the evidence.

Keely has remarried since the divorce. She has two young children from this marriage. Her husband is employed full-time. Keely is a registered nurse and a homemaker. She has worked full-time outside the home at times, but is currently employed on an on-call basis with a hospital. This requires her to work at least one day each month, which consists of an eight-hour shift. She plans to work one or two days each month. She is very involved in the lives of her four children.

We respect Keely's decision to limit her work hours so she can assume greater responsibility for the daily care of her four children. *See Bonnette*, 492 N.W.2d at 722–23. The children will benefit by the arrangement. Moreover, Christopher will not suffer a substantial injustice by using Keely's actual earnings to determine his child support obligation. The actual percentage difference between Christopher's support obligation using Keely's actual income and her earning capacity is minimal. Further, the relevant factors to consider in assessing earning capacity include employment history, present earnings, and reasons for failing to work a regular work week. *Gable*, 474 N.W.2d at 583. In this light, it would be improper to use a full work week to establish Keely's earning capacity. As a parent and spouse, Keely must balance her home life with her professional life.

We find Keely's net monthly earnings to be over $101, but less than $200. We also find that Christopher's original child support obligation of $433 deviates by more than ten percent from the support obligation under the current guidelines. Accordingly, we modify Christopher's child support obligation. Under the current child support guidelines, Christopher would be required to pay $383 per month in child support. However, because Christopher is required to contribute $75 per month towards the children's health insurance premiums, we vary from these guidelines and order Christopher to pay monthly child support of $340.

The costs of the appeal are taxed equally to the parties.

**AFFIRMED AS MODIFIED.**