# IN THE COURT OF APPEALS OF IOWA

No. 17-0251
Filed December 20, 2017

IN RE THE MARRIAGE OF MEGAN A. SLIFE
AND BRIAN A. SLIFE

Upon the Petition of
MEGAN A. SLIFE,
      Petitioner-Appellant,

And Concerning
BRIAN A. SLIFE,
      Respondent-Appellee.
_____

      Appeal from the Iowa District Court for Buchanan County, John J. Bauercamper, Judge.

      Megan Slife appeals the district court's modification of visitation provisions of the decree dissolving her marriage to Brian Slife. **AFFIRMED.**

      Daniel H. Swift of Swift Law Firm, Manchester, for appellant.

      Gary McClintock of McClintock Law Office, Independence, for appellee.

      Sarah Dooley Rothman of Rothman Law Office, Independence, for minor child.

      Considered by Danilson, C.J., and Doyle and Mullins, JJ.

**DOYLE, Judge.**

Megan Slife appeals the district court's order modifying the visitation provisions of the decree entered dissolving her marriage to Brian Slife. She contends Brian did not prove there had been a change in circumstances to support modification, the expanded visitation order was not in the child's best interests, and her affirmative defenses relating to equitable defenses as pled should have been sustained to bar Brian's petition for modification of the decree. We affirm.

### I. Standard of Review.

Our review is de novo. *See In re Marriage of Harris*, 877 N.W.2d 434, 440 (Iowa 2016). "We give weight to the findings of the district court, particularly concerning the credibility of witnesses; however, those findings are not binding upon us." *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). The controlling consideration in child custody cases is always the child's best interests. *See In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015).

### II. Background Facts and Proceedings.

In May 2013, Megan filed a petition seeking dissolution of her eleven-year marriage to Brian. She sought sole custody and care of the parties' child, born in 2004. Her petition stated: "Each party should be granted liberal and reasonable visitation rights with the child." Thereafter, "based upon the agreement of the parties," the district court entered a temporary order placing the child in their joint legal custody, with "primary placement" of the child with Megan, and Brian having "custody of the child on alternating weeks beginning the week of June 30, 2013. This alternating week visitation will take place from 8 a.m. on Tuesday morning until 5 p.m. on Wednesday evening."

Despite the parties' agreement and the court's order, visitation was denied because of allegations the child was afraid of Brian. In July 2013, Brian filed an application for appointment of a guardian ad litem (GAL) to represent the child's interests. He also requested the child be evaluated by a child psychologist. A GAL was appointed in September 2013, and the child began counseling in December 2013.

In July 2014, the GAL filed her report to the court. She reported

the child suffers from severe PTSD/Developmental Trauma Disorder to the extent that visits between the child and [Brian] have not been possible. All professionals involved have agreed that a positive prognosis exists but will require no personal contact between the child and [Brian] for some time yet. Progress has been occurring this summer as the child has been feeling more stable at home, came to accept that he did not need to constantly be on alert for his father's presence in their neighborhood, and began to voluntarily process his emotions.

The GAL stated Megan had "consistently demonstrated a willingness to have the child re-establish and maintain a positive relationship with [Brian]," and the GAL recommended that visitation between Brian and his son "begin once the child's therapist indicates it is appropriate" and "to proceed at a pace and in a manner consistent with" the therapist's recommendations. The GAL noted it was her understanding that Megan and Brian agreed with the recommendation.

In July 2014, the parties reached an agreement resolving all of the underlying issues in the dissolution. The district court approved the agreed upon decree and filed it on October 7, 2014. The court concluded the parties' agreements relating to the minor child were in the child's best interests. Based upon the parties' agreements, the parties were awarded joint legal custody of their child, with Megan having physical care of the child and Brian having visitation.

Brian's visitation was to occur "as recommended by" the child's therapist and the GAL. Additionally, the parties expressly agreed, and the decree provided, that if Brian was "not satisfied with the level or extent of visitation" he received, he could "request an additional hearing in six months to address the issue of visitation . . . without a showing of a material and substantial change in circumstance." Since entry of the decree, the parties have engaged in nearly continuous litigation over various matters.

In August 2015, Brian filed an application for visitation, alleging he had not had any visitation with his son even though he requested visitation on many occasions. Megan moved to dismiss the application. Brian did not file a resistance, and the application was dismissed by the district court.

Though the child continued to participate in therapy, the child's anxiety and stress concerning Brian persisted. In October 2015, the GAL filed a report advising the court that "the issues that caused this unusual situation of no visitation have not resolved yet," nor was the conflict between the parties resolved. The GAL noted Brian and the child were exchanging letters through the child's therapist, but the child had increased anxiety related to the interaction. The GAL stated she would not recommend progressing to telephone contact between Brian and the child until the child was "no longer traumatized by exchanging letters with his father and is ready to move to the next step."

In July 2016, Brian filed a petition to modify the decree seeking visits with the child. As of that date, Brian had still not had any visitation with his son. Megan filed an answer in response, challenging, among other things, Brian's assertion he "was given the right to request a hearing without an additional showing of a material

[and] substantial change [in] circumstances if there were issues with his visitation."

She also asserted several affirmative defenses, including the petition for modification was a collateral attack on the 2014 decree and was barred by laches, equitable estoppel, ratification, and the doctrine of unclean hands.

The matter proceeded to trial in January 2017. The district court summed up the pertinent history in its order as follows:

> During the marriage, [the child] had a close relationship with both parents and their extended families, including grandparents, who all lived nearby.
>
> Megan and Brian separated after an incident in the spring of 2013 at their home, when Megan accused Brian of assaulting her. [The child] was also in the house at the time and was aware of the incident. Brian left the family home, and Megan remained in the home with [the child].
>
> Brian was charged with domestic abuse assault causing bodily injury based upon Megan's complaint to authorities. Megan also obtained a no-contact order in the criminal case. Brian entered a plea of not guilty, and the case did not go to trial until 2014. Following a bench trial to [the court], Brian was found not guilty and the criminal no-contact order in that case was terminated.
>
> Following the 2013 separation, Brian's relationship with [the child] steadily deteriorated, and [the child] became estranged from his father, his father's family, and his father's friends.
>
> In the summer of 2013, Megan reported Brian for violating the no-contact order in the criminal domestic assault case by contacting her. He was charged with the simple misdemeanor offense for that and found guilty by a judicial magistrate in October of 2013. A five-year sentencing no-contact order was issued by the magistrate which expires in October of 2018. Therefore, Brian has been prohibited from having contact with Megan continuously since that time.
>
> Neither parent has a criminal record, other than the incidents described in this decree. Neither has a documented substance abuse history. Both have maintained regular employment.
>
> [The child's] interests were represented by a GAL in the original proceedings, and he received the benefit of counseling services to deal with the negative feelings he had had toward his father. The GAL assisted in trying to facilitate visitation. Despite these efforts, regular visitation was not occurring at the time the case was settled on the eve of trial in the summer of 2014. Brian agreed to a counseling process as part of the decree which was intended to

lead to the implementation of a visitation schedule. He was told at the time that it should take about six months.

Brian's last in-person contact with his son was in the fall of 2014.

Expert witnesses now diagnose [the child] with post-traumatic stress syndrome as a result of the conflict between his parents, and he continues to refuse to accept any contact with Brian. They recommend continued therapy and limited contact with Brian until progress is made.

Brian accuses Megan of playing a key role in fostering his son's continued estrangement from both him and his extended family. This is the basis for his request for sole placement, because he believes that he will never be able to have a relationship with his son if he continues to live with Megan.

The parents have had no contact or communication with each other on any issues affecting the welfare of their child. They have been involved in litigation with each other almost continuously since they separated nearly four years ago when their son was eight years old.

At the time of the trial in this matter, Brian had still had no visitation with his son. He pointed out that the initial opinion of the child's therapist was that the child would be ready to resume visits with Brian after six-months of therapy. Despite the child's continued therapy and Brian's lack of contact with the child but for letters received through the therapist, there was little-to-no progress towards resuming visits between the child and Brian. Brian believed Megan was coaching the child to be afraid of him, and he did not know what more he could do to reinitiate contact with his son.

The child's therapist testified that, "when it comes to anxiety related to [a] relationship with a parental figure," the child's case was "probably the most extreme case" she had seen in her twenty-two year career. The therapist believed the child was making some progress—the child's anxiety had decreased since ceasing contact with Brian, and his appointments had decreased from weekly sessions to bi-weekly sessions. The child was on anxiety medication and

functioning better at school. Nevertheless, even reading letters from Brian continued to be difficult for the child. The therapist believed Brian was the cause of the child's anxiety and Megan had nothing "to do with [the child's] feelings about his father." The therapist was also in contact with the child's psychologist concerning treatment, and she agreed with the psychologist's opinion that the child be given at least a one-year respite from contact with Brian "so that his mental health therapy can concentrate on helping him to heal memories of trauma associated with his father."

Following the trial, the district court entered its order denying-in-part and granting-in-part Brian's petition for modification. The court found there was not sufficient evidence presented to support a change in custodial placement. However, the court concluded: "No good cause has been shown for nearly permanent deprivation of visitation. Leaving all visitation up to the third parties' sole discretion has not made any progress. A visitation schedule should be established on a gradual basis following additional counselling." The court modified the language of the decree as follows, along with setting a schedule for reunification, in relevant parts:

> 1. The parties are encouraged to continue with counseling and therapy. Such services should include both parents and the child. The provisions in the prior decree delegating visitation decisions to third parties is canceled.
> 2. Beginning 30 days after the date this decree is filed, the respondent may contact his son once per week by US mail, email, or text message.
> 3. Beginning 60 days after the date this decree is filed, the respondent may additionally contact his son once per month by telephone or by a skype type communication.
> 4. Respondent may send his son birthday and Christmas gifts annually.

5. Beginning 120 days after the date this decree is filed, the respondent may have 1 monthly one-hour in person visit on a Sunday afternoon with his son in the City of Independence supervised by the GAL, for a period of two months.

6. Beginning 180 days after the date this decree is filed, the respondent may have 1 monthly unsupervised 4-hour in person visit on Sunday afternoons in the City of Independence, for a period of 2 months.

7. Beginning 240 days after the date this decree is filed, the respondent may have one unsupervised visit per month with his son anywhere within a 50 mile radius of the City of Independence, from 9 a.m. Saturday until 4 p.m. on Sundays, for a period of 4 months.

8. Beginning one year after the date this decree is filed, the respondent may have one unsupervised visit per month with his son anywhere, from 9 a.m. Saturday until 4 p.m. on Sundays.

9. Beginning two years after the date this decree is filed, the respondent may have two unsupervised 7 day visits during the months of June, July, and August of each year.

Both parties filed post-trial motions, which were denied by the court. Megan now appeals the court's modification of the decree. She contends Brian did not prove there had been a change in circumstances to support modification, the expanded visitation order was not in the child's best interests, and the court should have sustained her affirmative equitable defenses to bar Brian's petition. Brian did not file a brief in response.

### III. Discussion.

A party seeking modification of a decree's custody provisions "faces a heavy burden, because once custody of a child has been fixed, 'it should be disturbed only for the most cogent reasons.'" *Harris*, 877 N.W.2d at 440 (citation omitted). This requires the moving party to establish both that "a substantial change in circumstances occurred after the decree was entered" and that the moving party has "a superior ability to minister to the needs of the [child]." *See id.* However, "[a] different, less demanding burden applies when a parent is seeking

to change a visitation provision in a dissolution decree." *In re Marriage of Brown*, 778 N.W.2d 47, 51 (Iowa Ct. App. 2009). In that situation, the parent need only show "there has been a *material change in circumstances* since the decree and that the requested change in visitation is in the best interests of the [child]." *Id.* at 51-52 (citation omitted); *see also Smith v. Smith*, 142 N.W.2d 421, 422 (Iowa 1966) ("It seems readily apparent a much more extensive change of conditions would be required to support a change of custody than would be necessary to justify a change of visitation rights."). "The rationale for this lower standard is found in the prevailing principle that the best interests of children are ordinarily fostered by a continuing association with the noncustodial parent." *In re Marriage of Salmon*, 519 N.W.2d 94, 96 (Iowa Ct. App. 1994).

Moreover, there is a narrow exception to the showing-of-a-change-in-circumstances requirement. Though it is disfavored, parties can agree to a later review by the court without showing a change in circumstances if the district court approves the provision and unequivocally provides such language in the parties' decree evidencing that intent. *See In re Marriage of Schlenker*, 300 N.W.2d 164, 166 (Iowa 1981); *see also Wells v. Wells*, 168 N.W.2d 54, 57 (Iowa 1969) (holding "the issue of custody here presented [in] the original decree was not final" because the parties "stipulated, with court approval, [that] the matter of custodial rights be subject to review on application of either party . . . without any change of circumstance showing"); *In re Marriage of Ruckman*, No. 13-1920, 2014 WL 3748601, at *5 (Iowa Ct. App. July 30, 2014).

### A. *Change in Circumstances.*

Megan challenges the district court's ruling—or lack thereof—on whether Brian established a change in circumstances as ordinarily required. Megan points out that the original decree states visitation between Brian and the child would be at the discretion of the child's therapist and GAL. However, she completely ignores the rest of the paragraph following that sentence; specifically, she agreed both that Brian was entitled to visitation with the child and that he

> should have the opportunity, in the event he is not satisfied with the level or extent of visitation, to request an additional hearing in six (6) months to address the issue of visitation. This request can be made by [Brian] without a showing of a material and substantial change in circumstance.

It is evident from the district court's judgment and decree that the court interpreted the language of the original decree to mean Brian was not required to establish a change in circumstances concerning visitation.[1] This makes sense under the unique facts of this case. Brian conceded at the last minute to give therapy a go for six months—the time estimated it would take for the child to be comfortable resuming contact with his father—in lieu of a trial. Furthermore, the language of the original decree does not guarantee Brian a change of custody or visitation; it merely allows that the change-of-circumstances condition be bypassed. As noted above, these clauses are disfavored but allowed if the parties agree and the court approves. That was the case here.

---

[1] Because our review is de novo, we need not separately consider whether the district court erred in not making an express finding concerning the change-in-circumstances requirement. *See Lessenger v. Lessenger*, 156 N.W.2d 845, 846 (Iowa 1968).

Even if Brian was required to show there had been a material change in circumstances since the decree was entered to support his request for modification of his visitation, we believe the unique facts here show such a material change. At the time the decree was entered, the parties and the mental-health professionals believed it would take around six months to get the child comfortable with contact from his father. When Brian filed his petition seeking modification, he had not seen his son in almost two years. The child had made little to no progress in therapy. This is clearly not something that was contemplated at the time of entry of the decree. Consequently, even if Brian was required to show a material change in circumstances, he met that burden under the facts of the case, and we affirm on this issue.

### B. Best Interests.

Citing to the opinions of the child's therapist, psychologist, and GAL that visitation would actually be detrimental to the child, Megan argues Brian did not establish that a change in visitation with the child was in the child's best interests. This is a much closer question, but ultimately, having reviewed the entire record de novo, we believe the court's visitation schedule is in the child's best interests.

We do not take domestic violence lightly. However, Brian was acquitted in June 2014 on two charges that he committed domestic abuse assault causing bodily injury to Megan on two occasions in February and March 2013. It is clear that the parties fought with one another on those occasions, but the court found the State did not meet its burden of establishing Brian committed the crimes beyond a reasonable doubt. Notably, the criminal court found neither Megan nor Brian "particularly credible," concluding both exaggerated during their testimony,

which the court believed was motivated to benefit each parent's position in the contentious divorce proceedings. Furthermore, the child—then a third-grader—testified at the criminal hearing in support of Megan's account of the incidents, but the court did not find the child to be credible either. The court noted that "[f]or months prior to the trial in this case, [the child] was living almost exclusively with Megan and had quite limited contact with [Brian]," and that twice during his testimony, the child referred to Brian as "Brian," rather than calling him "dad." The court also found the child admitted, under oath at trial, that he had "made at least one significant statement that was not true or was inaccurate" at his deposition, while under oath.

We are troubled by the child's extreme anxiety relating to Brian. Both of the child's mental-health professionals have diagnosed the child as suffering from PTSD, and both believe Megan had not negatively influenced the child against Brian. Yet, the criminal court implied it believed Megan had influenced the child. The court further concluded:

> [The child's] inconsistent statements while under oath about what happened [in the March 2013 incident] are relevant to whether Megan rather than [Brian] escalated the argument in the bathroom from yelling to physical contact. To the court, [the child] appeared to be frightened (not necessarily by any particular person but by the situation in which he found himself), under pressure, and more concerned about whether he was saying what he was expected to say than whether he was giving an accurate rendition of the events . . . from his own memory. The only portion of [the child's] testimony that the court finds reliable and accepts without reservation is that [the child] overheard a lot of yelling between his parents that he did not understand and wanted to block out.

The Iowa Department of Human Services (DHS) confirmed a child abuse report based upon the March 2013 incident. During the DHS's investigation, the

child told the case worker "that it bother[ed] him the way his dad treats his mom. He state[d] that he thinks about it a lot and is scared." The child went on to report "his dad treats him appropriate[ly] and [did] not identify any times in which his dad has been aggressive to himself." The case worker concluded:

> This is the first contact that the [DHS] has had with this family regarding safety concerns for the child. With the exception of the incident, . . . the parents have generally isolated their conflicts to occur away from [the child's] physical presence. [The child] was not injured . . . . Therefore, this incident will be considered minor, isolated, and unlikely to re-occur. As a result, this assessment is CONFIRMED and will NOT be placed on the child abuse registry.
> . . . .
> The parents have maintained a very unstable marriage through the past 6 months and appear to have little trust [in] one another. This appears to have taken a toll on [the child,] as he seems to be experiencing anxiety and angst in his relationship with his father.

Still, one of the child's teachers reported she was concerned by Megan's behavior. The teacher reported the child did not "complete homework on a regular basis," and when the teacher asked the child why, the child said he asked Megan for help but was told to "just be quiet and stop talking." After the teacher was subpoenaed by Brian in this matter, Megan's behavior toward the teacher became negative, ultimately resulting in the child's removal from the teacher's classroom at Megan's request with claims the child accused the teacher of following him around the school and spying upon him.

Upon our de novo review, we do not find the child's extreme fear of Brian to be supported by the facts in the record. This does not mean the child's fear is not real, but we cannot justify withholding Brian's involvement in his son's life based upon the child's misperceptions. The record shows Brian was willing to go slow and give the child time to adjust to contact with him. The child had been in therapy

or treatment for over three years at the time of trial, with little-to-no progress. As the trial court noted, "leaving all visitation up to third parties' sole discretion has not [resulted] in any progress." We observe that at this rate, the professionals will probably not recommend visitation between Brian and his son until after the child becomes an adult. Ultimately, we agree with the trial court that no good cause has been shown for the nearly permanent deprivation of visitation. For all of these reasons, we believe modifying the visitation schedule to reunite the child and his father slowly to be in the child's best interests. Accordingly, we affirm on this issue.

### C. Affirmative Defenses.

Finally, Megan argues the court should have dismissed Brian's petition based upon her asserted affirmative defenses, including laches and the doctrine of unclean hands. She maintains Brian knew at the time he agreed to the terms of the original decree that he had already made a decision to move out of state. She suggests Brian "knew or should have known [the move] would adversely affect his ability to see his son and/or participate in the requirements of the care providers in connection with reunification with his son." She asserts in her brief that Brian should not be rewarded for this "inequitable, unfair and dishonest" conduct. Then she asserts the overwhelming evidence shows contact between Brian and his son at this time would be harmful to the child, "at least in the opinions of the experts" and that the GAL does not recommend expanded visitation at this time. We find no merit in Megan's claims concerning her asserted affirmative defenses. We therefore affirm on this issue.

*IV. Conclusion.*

We believe it is evident from the district court's judgment and decree that the court interpreted the language of the original decree to mean Brian was not required to establish a change in circumstances concerning visitation. In any event, upon our de novo review of the record, we find that even if Brian was required to make such a showing, he met that burden under the unique facts of the case. Additionally, we believe modifying the visitation schedule to reunite the child and his father slowly to be in the child's best interests. Finally, we find no merit in Megan's claims concerning her asserted affirmative defenses. Accordingly, we affirm the district court's order modifying the visitation provisions of the parties' dissolution decree.

**AFFIRMED.**