**IN THE COURT OF APPEALS OF IOWA**

No. 18-1929
Filed September 11, 2019

**IN RE THE MARRIAGE OF JONATHAN PATRICK TRIBOLET
AND LISA DIANA TRIBOLET**

**Upon the Petition of
JONATHAN PATRICK TRIBOLET,**
        Petitioner-Appellee,

**And Concerning
LISA DIANA TRIBOLET, n/k/a LISA DIANA HITCH,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Taylor County, Patrick W. Greenwood, Judge.

        A former wife appeals a district court order following cross applications to modify the custody provisions of a dissolution decree. **AFFIRMED AND REMANDED.**

        Andrew J. Zimmerman of Nielsen & Zimmerman, PLC, Corning, for appellant.

        Rodney K. Maharry, Clive, and Jami J. Hagemeier of Williams & Hagemeier, P.L.C., Des Moines, for appellee.

        Considered by Vaitheswaran, P.J., and Tabor and Bower, JJ.

**TABOR, Judge.**

In their 2015 divorce decree, the district court granted Lisa and Jonathan Tribolet joint physical care of their two sons. In 2017, the parties petitioned to modify that physical care arrangement. Finding Lisa's move from Bedford to Atlantic qualified as a substantial change in circumstances, the district court granted modification. The court ordered split physical care, awarding Lisa physical care of their older son and Jonathan physical care of their younger son.

On appeal, Lisa challenges this arrangement, arguing both children would do better in her physical care. Because we find the court-ordered arrangement is in each child's best interests, we affirm. But we remand for the district court to enter an order on appellate attorney fees.

## I. Facts and Prior Proceedings

Lisa and Jonathan married in November 2008 and lived in Bedford. They separated a year later but did not file for divorce until 2015.

Lisa and Jonathan have two sons, J.A.T., born in 2004, and J.P.T., born in 2008. J.P.T. is the biological son of Lisa and Jonathan. J.A.T. is Lisa's biological son, adopted by Jonathan. Lisa also has two adult children. While Lisa and Jonathan were separated, the two boys lived with Lisa during the week and spent weekends with Jonathan. When they divorced, Lisa and Jonathan agreed to joint custody and shared physical care. They split the weekdays and alternated weekend parenting times. Both Lisa and Jonathan lived in Bedford, and the boys went to Bedford schools.

After the separation, Jonathan moved in with his parents and sister. In this extended family setting, Jonathan's parents took on many of the daily caregiving

duties for J.A.T. and J.P.T. Although undiagnosed until 2013, Jonathan had developed a brain tumor. He could not work and the condition may have contributed to his lack of involvement in caregiving duties. Jonathan received treatment and achieved an almost full recovery except for some minor memory lapses. He returned to work at a manufacturing plant in Corning.

After divorcing Jonathan, Lisa married Robert Hitch. Robert has physical care of his thirteen-year-old daughter from a prior marriage. In June 2017, Lisa and Robert moved to Atlantic— about one hour away from Bedford. Lisa now works as a nurse consultant for an insurance company from an office in her home. Before that, she worked as a hospice nurse, which required traveling a "considerable distance" to see patients.

Two months after her move, Lisa petitioned to modify the decree, seeking physical care of the children. She alleged a substantial change in circumstances arose when Jonathan moved in with his fiancée, Megan, leaving the boys in his parents' home. Jonathan delegated most of his parenting duties to his parents and sister, according to Lisa's application. And she alleged Jonathan's family— especially his mother—treated J.A.T. less favorably than J.P.T. Lisa believed the favoritism hurt both boys. Lisa asserted she could minister to their needs better as a primary caregiver.

Jonathan answered, alleging Lisa's move to Atlantic was a substantial change in circumstances.[1] Jonathan believed both boys would fare better in his physical care. He pointed to Lisa's lack of involvement with the children's

---

[1] Although Jonathan did not label his answer as a cross-application, he did seek physical care of the children.

schooling and extracurricular activities. He alleged her disengagement contributed to J.A.T.'s ongoing behavioral and academic issues.

While awaiting trial, Lisa and Jonathan agreed to a temporary custody arrangement keeping J.P.T. in Jonathan's physical care and transferring care of J.A.T. to Lisa. J.A.T. began attending school in Atlantic.

Before trial, the court appointed a custody evaluator to provide an impartial opinion on the care arrangement. Dr. Sheila Pottebaum conducted a series of interviews with Lisa, Jonathan, J.A.T., and J.P.T., in several configurations: the parents individually and together; the children individually and together; and the children with each parent. She also interviewed Robert and Megan. She considered the parents' medical and employment records, the children's school records, and letters of support from friends and family.

Dr. Pottebaum concluded both Lisa and Jonathan are competent and loving parents. She found both had relied on extended family to help out. But Jonathan did not "appear as though he took on many of the routine parenting tasks" since he moved in with his parents in 2009. The evaluator further noted, "While it is very possible that Jon's family members provided solid structure and routine, they are not the parents . . . and it remained Jon's responsibility to provide the parenting." The boys reported Jonathan sometimes has dinner with them but spends nights at Megan's residence. The boys also reported Jonathan takes them to their sports activities.

Megan told the evaluator Jonathan lived with her for about six months until news came that the court would reevaluate the parenting plan. During that stretch, Megan said Jonathan would spend about an hour on weeknights with the boys at

his parents' house and would stay overnight there on weekends. Megan discussed the likelihood she would marry Jonathan in 2020. She explained that she loved Jonathan's sons, but "was not ready to take on raising children in her home at this time."

Dr. Pottebaum observed Lisa and Robert have a more "traditional" family arrangement and together handle all household and parenting duties for their blended family.

More noteworthy than Jonathan's conduct though was that of his mother. Dr. Pottebaum believed the "major point of contention appears to be the difficulty [J.A.T.] has experienced with his paternal grandmother. . . . [J.A.T.'s] perceptions have been verified by [J.P.T.] and, to some degree, by Jon as well." J.A.T. reported his grandmother belittled him and spoiled or "babied" J.P.T. She excluded J.A.T. from family activities. And the boys recalled her making comments about J.A.T. not being "a blood family member." J.P.T. said his father would not stand up to their grandmother. Dr. Pottebaum recommended J.A.T. live mainly with Lisa in Atlantic, as he had been doing under the temporary orders.

Dr. Pottebaum also opined the brothers would benefit from growing up in the same household. The boys both professed a preference for living together. For J.A.T. specifically, Dr. Pottebaum stated, "Now that [J.A.T.] has moved to Atlantic, a move back to Bedford against his volition would be poorly advised." That meant, she concluded, J.P.T. should live with J.A.T. at Lisa's house in Atlantic with ample visitation time for Jonathan.

The trial court considered Dr. Pottebaum's evaluation but chose to go another way. The court modified the decree to split custody: it placed J.A.T. in

Lisa's physical care and J.P.T. in Jonathan's care. The court also ordered a visitation schedule so that the boys spend weekends together alternating between their parents' households. Lisa appeals.[2]

## II. Scope and Standard of Review

"Petitions to modify the physical care provisions of a divorce decree lie in equity." *In re Marriage of Harris*, 877 N.W.2d 434, 440 (Iowa 2016) (quoting *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015)). "Thus, we review the district court's decision de novo." *Id.* (citing *In re Marriage of Sisson*, 843 N.W.2d 866, 870 (Iowa 2014)).

We make our own findings of fact but "give weight to the district court's findings" particularly relating to witness credibility. *Id.* (citing *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013)). In this kind of case, with a close question on physical care, we are especially mindful that the trial judge "had the added advantage of being able personally to watch and listen to the parties and the other witnesses." *In re Marriage of Jones*, 309 N.W.2d 457, 462 (Iowa 1981).

## III. Analysis

This appeal presents three questions.

A. Did the court err in awarding Jonathan physical care of J.P.T., splitting the brothers between two households?

B. Should we change the visitation schedule?

C. Should we award appellate attorney fees to Jonathan?

---

[2] Jonathan does not cross-appeal the order placing J.A.T with Lisa.

### A. Physical care

Lisa contends the district court erred in not awarding her physical care of both children. First, she argues her move to Atlantic did not constitute a substantial change in circumstances. In her view, there was a substantial change in circumstances because Jonathan moved in with his girlfriend. Second, she protests the court placing J.P.T. in Jonathan's physical care. She contends she is better able to minister to his needs. Third, she challenges the court's order of split custody. We address each argument in turn.

### 1. Substantial change in circumstances

"Courts are empowered to modify the custodial terms of a dissolution decree only when there has been a substantial change in circumstances since the time of the decree not contemplated by the court when the decree was entered, which is more or less permanent and relates to the welfare of the child." *In re Marriage of Malloy*, 687 N.W.2d 110, 113 (Iowa Ct. App. 2004). Here, both parties sought to modify the decree—but for different reasons.

In Lisa's estimation, Jonathan's move to Megan's home, leaving the boys at his parents' residence constituted a substantial change in circumstances warranting a modification of custody. Jonathan testified he lived with Megan for about six months, March through November 2017, then moved back with his parents. The district court found his cohabitation with Megan was not a permanent and continuous change in circumstances. Instead, the court found Lisa's move to Atlantic was a substantial change requiring modification of the custody arrangement.

Because the parents agree modification of the shared-care arrangement was warranted, it is unnecessary to decide whether the district court was wrong in rejecting Lisa's theory on the substantial change in circumstances. *See, e.g.*, *Smith v. Littrel*, No. 02-1477, 2003 WL 21544496, at *2 (Iowa Ct. App. July 10, 2003) (finding parents agreed shared care was "not working," and modification was warranted because it "appear[ed] that the children, by having a primary caregiver, will have superior care").

### 2. Physical care of J.P.T.

Lisa next argues the district court should have placed J.P.T. in her physical care. When the existing custody arrangement provides for joint physical care and the court has found a substantial change in circumstances, the question is which parent can offer better care. *In re Marriage of Kreager*, No. 10-0945, 2011 WL 1584293, at *2 (Iowa Ct. App. Apr. 27, 2011). We seek to place the children in the environment most likely to enhance their physical health and social maturity. *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). We consider the statutory factors listed at Iowa Code section 598.41(3) (2017) and those identified in *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974).[3]

---

[3] From those lists, we find the significant factors to be
       1. The characteristics of each child, including age, maturity, mental and physical health.
       2. The emotional, social, moral, material, and educational needs of the child.
       3. The characteristics of each parent, including age, character, stability, mental and physical health.
       4. The capacity and interest of each parent to provide for the emotional, social, moral, material, and educational needs of the child.
       5. The interpersonal relationship between the child and each parent.
       6. The interpersonal relationship between the child and its siblings.

Lisa argues she can provide better parenting to J.P.T. because she works from home with flexible hours and is attuned to J.P.T.'s needs. She contends Jonathan does not spend his parenting time doing hands-on parenting. Instead, he leaves those duties to *his* parents while he spends time at Megan's house. Lisa points to J.P.T. telling Dr. Pottebaum that Jonathan only sometimes eats dinner with the family. Dr. Pottebaum also reported Jonathan did not assist in routine caretaking for J.P.T. Lisa also points to Dr. Pottebaum's recommendation that J.P.T. and J.A.T. live together.

At trial, Jonathan admitted spending most nights with Megan. But he testified he sees J.P.T. after school, stays for dinner, and leaves when J.P.T. goes to bed. Both boys told Dr. Pottebaum they never saw their dad in the morning because of his early work schedule, even before he started staying the night with Megan. Jonathan argues it is more important for him to connect with J.P.T. through his coaching and involvement at school than to participate in cooking and cleaning. He also asserts it benefits J.P.T. to grow up close to his extended family and his aunt, who is a teacher at his school and helps him with his homework.

Jonathan bolstered his position with testimony from staff at J.P.T.'s school. The boy's third-grade teacher testified he is doing well academically and socially.

7. The effect on the child of continuing or disrupting an existing custodial status.
8. The nature of each proposed environment, including its stability and wholesomeness.
9. The preference of the child, if the child is of sufficient age and maturity.
10. The report and recommendation of the attorney for the child or other independent investigator.

*Winter*, 223 N.W.2d at 166–67.

His guidance counselor gave a similar report. The principal verified Jonathan is active as a coach for J.P.T.'s sports teams.

By contrast, educators complained Lisa did not communicate well with them about the children. They perceived she was not as involved in the boys' education or extracurricular activities as Jonathan. When J.A.T. attended Bedford schools, they had a hard time reaching her about his behavioral and attendance issues.

In the same vein, Jonathan testified he was concerned with Lisa's ability to discipline J.P.T., assist with his homework, and establish a consistent schedule for him. Jonathan blamed Lisa for J.A.T.'s academic problems as well as those of Lisa's adult children, one of whom did not graduate from high school.

Lisa acknowledged she did not get involved with J.P.T.'s sports. And she did not attend his parent-teacher conferences or communicate with his teacher. But Lisa did perform the day-to-day tasks of parenting, including preparing meals for the boys, transporting them to activities, and helping with their evening routines.

By our assessment, neither parent is the runaway choice for providing physical care for J.P.T. Both bring strengths to bear. But we are troubled by Jonathan ceding his routine parenting responsibilities to his parents and sister. And equally troubled by Lisa's lack of attention to J.P.T's schooling.

The tiebreaker is the stability of the nine-year-old's current situation. J.P.T. has been attending Bedford schools. His friends and extended family are in Bedford. During the modification action, the parties stipulated J.P.T. would stay with Jonathan. He is doing well in that placement. Although J.P.T. expressed a desire to live with his brother, he also told the custody evaluator he wanted to live at his mom's house and his dad's house. The shared care arrangement is not

doable given the distance between their homes. Like the district court, we find J.P.T.'s desire to live with his brother is not a compelling reason to take him away from the school and community in which he is thriving. J.P.T. would be starting over in Atlantic, and Lisa has not shown she can put him on as smooth a path as he is already walking in the Bedford community. Jonathan has shown he can render better care for J.P.T and ensure his long-term growth and social maturity. We affirm the award of physical care of J.P.T. to Jonathan.

### 3. Split custody

Lisa also condemns the modification order because it splits custody of the brothers. She believes the district court improperly discounted Dr. Pottebaum's advice to keep the children together.

True, our cases presume siblings should not be separated. *See In re Marriage of Will*, 489 N.W.2d 394, 398 (Iowa 1992). Split physical care "deprives children of the benefit of constant association with one another." *Id.* But in some cases separation *will be* in the children's best interests. *Id.* The reasons for a split custody decision must be "[g]ood and compelling." *Id.*

Both J.A.T. and J.P.T. expressed a desire to live together. The district court acknowledged their wishes but also recognized a child's preference is not the defining factor in a modification proceeding. *See In re Marriage of Jahnel*, 506 N.W.2d 473, 475 (Iowa Ct. App. 1993). Other factors courts may consider include the difference in age between the children, their relationship, and the likelihood the undesirable habits of the older child might influence the younger child. *See Will*, 489 N.W.2d at 398 (noting additional factors in Annotation, *Child Custody: Separating Children by Custody Awards to Different Parents—Post–1975 Cases,*

67 A.L.R.4th 354 (1989)). Here, the boys are five grades apart. J.A.T. is in high school, while J.P.T is still in elementary school. The record reveals they have a warm relationship and come together for weekend activities—everything from science experiments to "filming little movies to playing video games" to fishing.

But J.A.T. was uncomfortable living at his paternal grandparents' house. He clashed with his paternal grandmother. Both J.A.T. and J.P.T. noted a disparity in the treatment J.A.T. received at Jonathan's house from Jonathan's mother. The district court found J.A.T.'s perception of being treated unfairly was "real and genuine." But the court also believed J.A.T.'s teenaged resistance to authority played a larger role. Under these circumstances, the district court offered a cogent reason to place J.A.T. in Lisa's physical care. But the district court found the potential benefit of the boys being together in Atlantic was not "enough to gamble with J.P.T.'s well-being." The court was "not willing to elevate the objectives of keeping these siblings together above assuring J.P.T. the opportunity for maximum continuing physical and emotional contact with both parents."

We credit Dr. Pottebaum's opinion that the chance for siblings to grow up together has "tremendous" value. But we also agree with the district court that removing J.P.T. from an environment where he is thriving in favor of spending more time during the school week with his brother carries a risk. Lisa has not shown enough interest in J.P.T.'s academics or extracurricular activities to support J.P.T. through them in the same way Jonathan has. It is in J.P.T.'s best interests to remain in Jonathan's care. The boys will spend every weekend together according to the new visitation schedule. Thus, we agree with the district court's

calculus in finding good and compelling reasons to split the siblings between their primary caregivers.

### B. Visitation schedule

Lisa next argues the court-ordered visitation schedule does not maximize the children's physical and emotional contact with both parents. That schedule allows the boys to spend every weekend together alternating between their parents' homes. Lisa contends if we uphold split physical care, we should consider adopting the visitation schedule proposed in Dr. Pottebaum's report.

We approach her request by recognizing "the reasonable discretion of the trial court to modify visitation rights and will not disturb its decision unless the record fairly shows it has failed to do equity." *In re Marriage of Salmon*, 519 N.W.2d 94, 95 (Iowa Ct. App. 1994) (citation omitted). We appreciate the premise of Lisa's argument—that the visitation schedule should maximize the children's continuing physical and emotional contact with both parents. Iowa Code § 598.41(1); *In re Marriage of Ruden*, 509 N.W.2d 494, 496 (Iowa Ct. App. 1993). But we cannot act on Lisa's request because she does not identify any specific deficiency with the visitation scheduled in the modification order.

Despite Lisa's endorsement, Dr. Pottebaum's visitation schedule aimed at a different situation. The evaluator offers recommendations for a physical care arrangement where both boys are with the same caregiver. Without more direction from the parties, we cannot readily apply Dr. Pottebaum's recommendations to their current arrangement. We thus decline to disturb the visitation schedule.

We echo the district court's sentiment that the parties are free to reach their own agreement to modify the visitation schedule to better meet the children's

needs. As the district court observed: "Refreshingly, the parties communicate and co-parent well." We encourage them to use that spirit of cooperation to implement a visitation schedule in the best interest of both boys.

### C. Appellate attorney fees

Jonathan requests appellate attorney fees. When considering that request, we examine "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005) (citation omitted). The decision rests in our discretion and is not a matter of right. *Id.* Two points are significant here. Lisa has a higher salary than Jonathan and did not succeed on appeal. Based on those facts, we find an award of appellate attorney fees is proper.

But because Jonathan has not provided an affidavit of attorney fees with documentation to support his request, we remand with instructions for the district court to determine a reasonable amount for the award. *See In re Marriage of Sullins*, No 14-1153, 2015 WL 4935620, at *4 (Iowa Ct. App. Aug. 19, 2015). We tax the costs of the appeal to Lisa.

**AFFIRMED AND REMANDED.**