# IN THE COURT OF APPEALS OF IOWA

No. 20-0507
Filed December 16, 2020

IN RE THE MARRIAGE OF LAUREN ASHLEY DEERY
AND JOHN JAMES DEERY

Upon the Petition of
LAUREN ASHLEY DEERY, n/k/a LAUREN ASHLEY DUHAIME,
    Petitioner-Appellee,

And Concerning
JOHN JAMES DEERY,
    Respondent-Appellant.

_____

Appeal from the Iowa District Court for Black Hawk County, Joel A. Dalrymple, Judge.


A father challenges the revised visitation schedule and increased child-support obligation. **AFFIRMED AS MODIFIED.**


Kevin D. Engels of Correll, Sheerer, Benson, Engels, Galles & Demro, PLC, Cedar Falls, for appellant.

Rebecca A. Feiereisen of Trent Law Firm, PLC, Cedar Falls, for appellee.


Considered by Vaitheswaran, P.J., Tabor, J., and Carr, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2020).

**TABOR, Presiding Judge.**

John Deery and Lauren Duhaime[1] are the parents of two sons, now ages six and four. John and Lauren ended their marriage by a stipulated decree in November 2018. They agreed to joint legal custody of the children, with Lauren assuming physical care and John having six overnight visits every two weeks. Lauren sought to modify the decree less than one year later after John faced charges for operating while intoxicated and child endangerment. After a modification hearing, the district court ordered John and Lauren to employ a parenting coordinator, eliminated four of John's overnights with the children for each two-week period, and enlarged his child-support obligation.

On appeal, John challenges the decrease in his time with the children and the increase in child support. In our de novo review, we find Lauren did not show reduced visitation with John was in the children's best interests. We thus restore the original visitation schedule and the child support ordered in the decree.

**I. Facts and Prior Proceedings**

After they separated in June 2018, John and Lauren reached an agreement on the custody and visitation of their sons. The agreement outlined that, at a minimum, John would have the children "[e]very Thursday morning at 8:00 a.m. until Friday morning at 8:00 and every other weekend from Friday morning at 8:00 until Monday morning at 8:00 a.m." On his visitation weekends, John had the boys from Thursday until Monday morning, giving him four overnights those weeks. On

---

[1] The dissolution decree restored Lauren's maiden name.

the opposite weeks, John had the boys overnight Thursday and overnight Sunday. That agreement merged into their stipulated decree.

John and Lauren followed this schedule until April 7, 2019. That evening, John picked up the boys at 4:00 p.m. and took them to his sister's home about an hour later. Around 5:45 p.m., Cedar Falls police responded to a local gas station after receiving a report that a driver who appeared intoxicated had damaged his truck. John was that driver. After interacting with John, police believed he was intoxicated. Later, the State charged him with operating while intoxicated, second offense. The State also charged John with two counts of child endangerment, alleging he was driving while intoxicated when he dropped off the boys at his sister's house. John disputed the claim that he drank alcohol before driving the boys, but a jury later convicted him of all three charges.

While interacting with the police, John expressed suicidal thoughts. So the officers took him to the hospital, where he remained for four days. From there, John went to inpatient substance-abuse treatment in Minnesota for thirty days. John did not have in-person visits with the children while being treated.

When John returned to Cedar Falls in May, Lauren asked to suspend their normal visitation schedule so he would not immediately have unsupervised time with the children. John objected; he did not want Lauren to dictate when he could interact with the children. According to Lauren, she expressed her concerns to a worker for the Iowa Department of Human Services who was investigating the April incident for a child-abuse assessment, and the worker suggested John's time with the children be supervised. Lauren then spoke to the county attorney, who obtained no-contact orders for the child-endangerment charges. Under those

no-contact orders, John needed to have specific family members supervise the time he spent with the children. That arrangement lasted until August 2019, when the court modified the no-contact orders to allow unsupervised contact.

As a condition of his unsupervised contact with the children, John must use an alcohol-monitoring program called SoberLink. For this program, John blows into a breathalyzer three scheduled times each day. Weekly results go to John's substance-abuse counselor and his probation officer.

In July 2019, Lauren petitioned for modification of the decree. She alleged that John's alcohol use created an "unsafe environment for the children." Before trial, the parties agreed to maintain joint legal custody and that Lauren would keep physical care. The issues remaining for the court to decide were visitation and child support. Lauren also asked the court to mandate a parenting coordinator.

At the modification trial in February 2020, John introduced into evidence all but one of the weekly SoberLink reports—spanning May 2019 through early February 2020. He had zero "non-compliant" tests. But the records showed John tested late several times each week and sometimes missed tests altogether. Yet his probation officer did not take any action to address those testing issues. John testified he last consumed alcohol on the day of his arrest in April 2019. He acknowledged a history of alcohol abuse but professed he had changed his life and was a better parent since he stopped drinking. John testified that he participates in an Alcoholics Anonymous (AA) meeting every Wednesday night.

Lauren questioned John's sobriety. She hired a private investigator who did surveillance on John at least a dozen times. Once, in September 2019, the investigator documented John buying a bottle of vodka at a convenience store.

The investigator noted John had his younger son with him at the time of the purchase. Lauren also pointed to twelve-hour gaps in John's SoberLink testing times that would allow him to consume alcohol without detection.

On top of her suspicions about John's drinking, Lauren testified that he calls her derogatory names in front of the children. For his part, John testified that Lauren manipulates what he says and has been "building a case" against him since their divorce. The record revealed that visitation exchanges were sometimes tense; Lauren often recorded them or had a family member recording nearby.

Lauren argued that John's arrest and convictions, along with their inability to communicate, constituted a material change in circumstances. As a modification, she asked the court to strike John's Sunday overnight visits because the boys were too tired on Mondays. She agreed that John's visits could extend through Sunday evening, when his extended family traditionally shared a meal. But Lauren asked that visitation end at 8:00 p.m., so the boys could get a good night's sleep and be prepared for the week ahead. She also asked the court to remove John's Thursday overnights on the weeks he had the children for the weekend. On those weeks, Lauren wanted John's visitation to start on Friday rather than Thursday at 8:00 a.m. She complained the children were out of her care "such long periods of time" those weeks.

John resisted any change to the schedule. He recognized his issues with alcohol came to a head after the court entered the decree but insisted he was a better parent in February 2020 than he was in November 2018. So in his view, any reduction in his time with the children was unwarranted. Plus, the court set the original visitation times to fit with his work schedule. John works about fifty

hours a week as a sales manager at his father's car dealership; his regular days off are Thursday and Sunday.

Finally, on child support, the court heard testimony about both parents' incomes. The decree had ordered John to pay $1400 in monthly child support—based on his annual income of $152,000 and Lauren's imputed income of $36,000. That child-support amount reflected an extraordinary visitation credit.[2] John and Lauren also agreed to split "[p]reschool and extra-curricular expenses above $50 for the minor children," with John paying seventy-five percent and Lauren paying the other twenty-five percent of those costs. At the modification trial, Lauren asked the court to use her actual income.[3] John urged the court to again impute an income of $36,000 to Lauren. He also noted that his gross annual income had decreased to $120,214. He asked the court to strike his obligation for the children's school and extracurricular expenses, claiming those costs were covered by his general support obligation.

The district court found a material change in circumstances since the decree and decided modification of visitation was in the children's best interest "given the acrimonious relationship of the parties." For these reasons, the court ordered Lauren and John to split the cost of employing a parenting coordinator.[4] The court also eliminated John's Thursday and Sunday overnights. That modification left

---

[2] Under the child-support guidelines, if the noncustodial parent's court-ordered visitation exceeds 127 days per year, that parent shall receive a credit to his or her share of the basic support obligation. *See* Iowa Ct. R. 9.9.

[3] Lauren testified she earns $22.00 per hour and works about twenty hours per week as an accountant for a dental office. She also owns an interior decorating business from which she earned $6000 in 2019.

[4] John resisted this imposition at trial, but he does not challenge that aspect of the court's ruling on appeal.

John with visitation from Friday at 8:00 a.m. until Sunday at 8:30 p.m. every other weekend. On the alternate weeks, John had interaction with the children from 4:00 p.m. until 8:30 p.m. on Sunday.

In recalculating child support, the court continued to impute Lauren's income at $36,000 and reduced John's income to what he earned in 2019—$120,214. Because his loss of overnights prevented John from receiving the extraordinary visitation credit, his child-support obligation increased to $1525.16 each month.

John appeals.

## II. Scope and Standard of Review

We review orders modifying dissolution decrees de novo. *In re Marriage of Pals*, 714 N.W.2d 644, 646 (Iowa 2006). We give weight to the district court's fact findings, but they do not dictate our decision. Iowa R. App. P. 6.904(3)(g). We will disturb the district court's ruling "only when there has been a failure to do equity." *In re Marriage of Okland*, 699 N.W.2d 260, 263 (Iowa 2005).

## III. Analysis

### A. Modification of Visitation

As the parent seeking to modify visitation, Lauren "must establish by a preponderance of the evidence that there has been a material change in circumstances since the decree and that the requested change in visitation is in the best interests of the children." *See In re Marriage of Salmon*, 519 N.W.2d 94, 95–96 (Iowa Ct. App. 1994) (noting courts require "much less extensive change in circumstances" in visitation than custody-modification cases). Counter to his position at trial, John now concedes Lauren met her burden to prove a material

change in circumstances. In his appellate brief, he admits that "[t]he issues arising from the incident that occurred on April 7, 2019 may fairly be characterized as a change in circumstances." But he challenges the court's reduction of his visitation time, arguing it is not in the children's best interests.[5] By contrast, Lauren argues it is the children's best interests "to reduce their contact with their father to ensure their continued mental and physical safety as [he] treats his affliction."

In sorting the parties' positions on visitation, two principles guide us. First, children "should be assured the opportunity for the maximum continuing physical and emotional contact with *both* parents." *See* Iowa Code § 598.41(1). Second, "[v]isitation or the denial thereof should not be made to appease one parent or punish the other." *See Smith v. Smith*, 142 N.W.2d 421, 424 (Iowa 1966).

Here, Lauren's aim to reduce the children's contact with John hints at another punishment for his criminal conduct. No question, his child-endangerment convictions were serious matters and required John to take remedial measures to ensure that he could safely resume unsupervised contact with the boys. But Lauren did not show by a preponderance of the evidence that John's in-patient treatment, AA attendance, and ongoing alcohol testing were insufficient to protect the children during John's unsupervised interactions. In fact, even Lauren's favored visitation schedule placed the boys in John's care for two overnights every other weekend. Her request to modify John's visitation to eliminate four other

---

[5] John points out that Lauren did not plead "communication issues" as a reason for modification in her petition. He argues this precludes us from considering these issues in our review of the district court's ruling. But these issues were detailed at trial—by both John and Lauren—and John never objected. What's more, as John recognizes, the district court relied on the evidence about communication issues in its ruling, and John did not file a post-trial motion challenging it.

overnights—which the district court granted—did not have a nexus to Lauren's suspicion that John continued to consume alcohol. *See Nicolou v. Clements*, 516 N.W.2d 905, 906 (Iowa Ct. App. 1994) (requiring parent seeking change in visitation schedule to show there has been a change of circumstances "to *justify* a modification of visitation rights" (emphasis added)); *see also In re Marriage of Stauffer*, No. 19-0670, 2020 WL 2061884, at *4 (Iowa Ct. App. Apr. 29, 2020) (affirming district court decision not to modify visitation schedule when parent requesting modification failed to show how proposed change in schedule would "fix" communication issues he claimed were a change in circumstances).

What Lauren did allege at the modification trial was that the children showed signs of wear and tear on Mondays. She testified that having a later bedtime and different routine at John's house negatively affected the beginning of their school week. That said, she did not object to John's four-and-one-half hour visitation each Sunday evening so that he and the boys could carry on the tradition of Sunday dinner with John's extended family. Lauren and John agreed that tradition was important and promoted the wholesome connection between the boys and their cousins.

Critical to our analysis, the court's change to the Sunday visitation schedule did not resolve Lauren's concern about the boys' routine. Lauren testified that the boys' bedtime at her house was 7:30 p.m. John testified that he puts the boys to bed by 8:00 p.m., "8:30 at the latest." Yet under the modified decree, the parents exchange the children every Sunday night at 8:30 p.m., an hour past what Lauren designated as their bedtime. In our de novo review, we find that Lauren did not establish that modification to the Sunday visitation schedule was in the children's

best interest. Thus, we restore the Sunday overnight visitations outlined in the original decree.[6]

Likewise, we find ending John's Thursday overnight visits was not in the children's best interests. First, Lauren only asked the court to eliminate John's Thursday overnights for the weeks he had weekend visitation, but the court struck all of them. Second, Lauren presented no evidence the Thursday visits brought any harm to the children, beyond her general complaint about how long they were out of her care. We find it significant that Thursday is one of John's two days off work, and the court approved the original visitation schedule with that in mind. Allowing John to keep his Thursday overnights with the children maximizes his available time with them. *See In re Marriage of Stepp*, 485 N.W.2d 846, 849 (Iowa Ct. App. 1992) ("[G]enerally, liberal visitation rights are in the children's best interests."); *see also* Iowa Code § 598.41(1)(a). The record shows that most recently these children have been happy, healthy, and well-adjusted after spending time with both parents under the terms of the original decree. The change in circumstances did not justify modifying the visitation schedule.

But we would be remiss in not echoing the district court's concerns about "the demeaning nature in which John addresses Lauren and her family." As the court aptly expressed: "Both parties are admonished that joint custody requires an attitude of cooperation and mutual respect which puts the interests of the minor children ahead of the personal interests of the parents." While he balked at the

---

[6] We note the parenting coordinator may address with John and Lauren any concerns about differences between the boys' routines at the two houses which may be counter to their best interests.

idea of a parenting coordinator at trial, on appeal John accepts that such an intermediary ordered by the court will help improve the parties' communication and cooperation when it comes to the children. Like the district court, we encourage the parties to set aside their animosity in the best interests of their children.

### B. Modification of Child-Support Obligation

John also challenges the district court's modification of his child-support obligation. In doing so, he takes a different stance than he did before the court. He now argues no substantial change in circumstances exists under Iowa Code section 598.21C(1) (2019). But John did not resist recalculation of child support in the pretrial stipulation or at trial. In fact, he advocated for the court to recalculate his obligation using his reduced income of $120,214 from 2019. Lauren questioned the accuracy of John's 2019 income from the car dealership, asserting: "It's the first year that in the 11 years that he's worked there . . . he has made less than the year before."

The criteria for modification of child support includes changes in a party's income or earning capacity. Iowa Code § 598.21C(1)(a). To merit modification, the change in circumstances must be permanent or continuous rather than temporary. *In re Marriage of Vetternack*, 334 N.W.2d 761, 762 (Iowa 1983). The record did not reflect that John's reduction in income would be permanent. He testified the dealership was not as financially successful in 2019 as the previous two years: "Any time we don't make as much as a store, I make less." That fluctuation did not merit recalculating his child support payments.

Turning to John's appellate argument, because we amend the modification ruling to restore his overnight visitations, he continues to qualify for the

extraordinary visitation credit. *See* Iowa Ct. R. 9.9 (providing for the application of an extraordinary visitation credit to the noncustodial parent's child-support obligation if the noncustodial parent has more than 127 overnights with the children). With no showing of a substantial change in circumstances to justify adjusting the child support due, the amount in the original decree should stand.

John also asks that we eliminate the requirement he pay seventy-five percent of the children's preschool and extracurricular expenses over fifty dollars. He maintains his support obligation should cover those expenses. We agree those expenses fall within the normal and reasonable cost of supporting a child, which inform the child support guidelines. *See In re Marriage of Heiar*, ___ N.W.2d ___, ___, 2020 WL 6157818, at *5–6 (Iowa Ct. App. 2020). But he did not preserve this issue for our review. John raised it in the pretrial stipulation. Yet the district court did not rule on the issue in the modified decree or the supplemental order for child support, and John did not file a post-trial motion requesting a ruling. *See Homan v. Branstad*, 887 N.W.2d 153, 161 (Iowa 2016) ("[W]hen a party has presented an issue, claim, or legal theory and the district court has failed to rule on it, a rule 1.904(2) motion is proper means by which to preserve error and request a ruling from the district court."). Thus the issue is not properly before us.

**IV. Conclusion.**

We modify the court's ruling to restore John's weekly Thursday and Sunday overnights and to reinstate the monthly child support payments of $1400.

**AFFIRMED AS MODIFIED.**