# IN THE COURT OF APPEALS OF IOWA

No. 20-1289
Filed June 16, 2021


**IN RE THE MARRIAGE OF SOMMER D. JACOBSON AND JEFFREY N. JACOBSON**

**Upon the Petition of**
**SOMMER D. JACOBSON, n/k/a SOMMER WASSER,**
        Petitioner-Appellant,

**And Concerning**
**JEFFREY N. JACOBSON,**
        Respondent-Appellee.
_____


Appeal from the Iowa District Court for Scott County, Marlita A. Greve, Judge.


Sommer Wasser appeals the grant of sole legal custody to Jeffrey Jacobson and reduction to her visitation. **AFFIRMED.**


Michael J. McCarthy of McCarthy, Lammers and Hines, L.L.P., Bettendorf, for appellant.

Catherine Z. Cartee and Chase Cartee of Cartee Law Firm P.C., Davenport, for appellee.


Considered by May, P.J., and Greer and Schumacher, JJ.

**GREER, Judge.**

Weary of the nature of Sommer Wasser's (formerly known as Sommer Jacobson) mothering style, Jeffrey Jacobson requested sole legal custody of their child, N.J. (born in 2009). We find ourselves hashing over the similar behaviors that resulted in a loss of physical care for Sommer in 2017. Now she appeals the district court determination of sole legal custody to Jeffrey and the reduction of her visitation rights. She also requests appellate attorney fees for having to resist a motion to dismiss her reply brief.

**I. Factual and Procedural Background.**

The legal jousting began in May 2015 when the district court awarded these then-divorcing parties joint legal custody of their child with physical care to Sommer and visitation to Jeffrey. By April 2016, Jeffrey applied to modify the custody arrangement and made several contempt applications against Sommer. In the meantime, Sommer announced she was moving with her husband, Steve Wasser,[1] their newborn child, and N.J. to Virginia because of her new husband's job change. After a modification trial in June 2017, the district court granted Jeffrey physical care with liberal visitation to Sommer. In May 2018, a panel of our court affirmed the modification ruling. *In re Marriage of Jacobson*, No. 17-1040, 2018 WL 1633512, at *4 (Iowa Ct. App. Apr. 4, 2018).

---

[1] Sommer married Steve in 2016, about six months before their child was born.

For the next year and a half until the next trial, N.J. lived in Iowa with Jeffrey and Jen Berger.[2]  Sommer lived in Virginia.  During questioning at trial, Jeffrey characterized Sommer's actions during that time as:

> Q. Do you think—is it your opinion that Sommer does not possess the ability to have a healthy relationship with [N.J.]?  A. That's correct.
> Q. What do you base your opinion on, Jeff[rey]?  A. On the number of messages and letters here, like some of those items that we included here in our exhibits, that send all sorts of insidious messages to [N.J.] that undermine our relationship and make it hard for him to live here, as well as the possessiveness.  It's almost like needing [N.J.] to be with her and needing [N.J.] to—you know, for her emotional well-being, rather than raising a child to eventually be a productive adult.

Indeed, Sommer sent daily notes and gifts to the child—some through Jeffrey and some through the school until the principal requested she stop sending packages to the school.  Jeffrey found the constant barrage of gifts and messages "subvertive" and "undermining."  Jeffrey thought the messages suggested "you will survive living with your father."  Many of the notes referenced topics such as: "you are stronger than you know"; "your [sic] my whole world"; "[activities for] days your [sic] missing home, feeling sad, frustrated, angry or even lost"; "if you can just get by, get by," and "you are brave."  On one gift, the note instructed, "Pick me up!  It smells like summertime.  Remember you'll be home soon."  Another note on a toy said: "Rainy day.  Put me together when things are seeming tough.  Just you.  No sharing.  Mom loves you."  She also sent a bottle of soap to N.J. with a note saying "Just turn on the warm shower.  Feel the warmth surround you with this soap.  It's like I'm holding you from far away."  Jeffrey feared that if he did not give N.J. the

---

[2] Jen and Jeffrey married in September 2017.  Jen has a younger child from a previous relationship that lives with them.

messages and gifts, Sommer would tell the child and use it to diminish the child's trust in Jeffrey. The district court characterized it as Sommer trying "to monopolize N.J.'s attention to the detriment of his father."

Jeffrey argued that similar to the actions in 2017, Sommer continued to subtly undermine Jeffrey's custodial rights. Sommer contended she simply acted as a loving parent. During Jeffrey's time with N.J., Sommer arranged a playdate for the child and texted Jeffrey the details without asking Jeffrey in advance. Sommer sent him texts about school delays and demanded to know where N.J. would be. Because of adjustment concerns,[3] Jeffrey scheduled appointments for the child with a counselor. The counselors' (there have been two) notes were exhibits at trial.

Typically for visitation, N.J. travels every three to four weeks to Virginia for a three-day weekend. Jeffrey asserted that the long distance travel was negatively impacting N.J. because Sommer was inflexible with the travel start and return times. Specifically, he was upset with travel arrangements that landed the child home after 10:45 p.m. to end the weekend with school the next day. He counted

---

[3] After the 2017 modification decision, the counselor made notes of statements made by N.J.:

> "The judge made a big mistake trading my whole family for just my dad," "The judge made a huge mistake. She had a surgery so she must have been on drugs," "I want to send my mom my money," "I can only trust family—not friends," "Dad's a liar! He is selfish," (to Jen) "You believe all of dad's lies. Everyone believes him, but not me! My mom tells me the truth," "I'll be moving back to Virginia in four months," "You're trying to keep me from my mom[,]" . . ."I'm on my mom's team," "Steve (stepdad) is my real dad, you're just my playmate dad," "you drained mine and my mom's bank accounts."

seven days of school missed due to various problems with flights on these weekends.

Text messaging wars are a part of the communication of these parents. In early 2019, Jeffrey sent a message to Sommer stating he had made plans with the child for an October weekend. Sommer wanted to visit Iowa to spend time with N.J. the same weekend.[4] As the weekend neared, Jeffrey learned that Sommer told N.J. she was coming for the weekend anyway. Jeffrey testified N.J. showed signs of anxiety with heartburn and chest pain as he was nervous about the weekend. Jeffrey arrived at school on Thursday afternoon to pick up N.J. Without notice to Jeffrey, Sommer was now in Iowa and had removed the child from the afterschool program. Sommer, her young child, and N.J. sat in the school playground. Because Jeffrey did not want N.J. in the middle of a dispute, he sent Sommer a text offering her an overnight visit if she would return the child to school on Friday. He confirmed to Sommer that he would then pick up N.J. on Friday for his family's weekend plan. As Jeffrey arrived on Friday afternoon, he saw Sommer at the school. When school released, Sommer first approached N.J., whispered to him, and, as Jeffrey observed, the child become "really sad." By the time he got to Jeffrey, N.J. was crying uncontrollably. They waited in the school as he calmed, but as they left to go to the vehicle, Sommer sat in the vehicle behind them. She approached N.J., and Jeffrey explained what he saw and heard:

> Sommer cupped [N.J.'s] face in her two hands like this (demonstrating), putting her hands on his cheeks, and she put her nose to his nose and she began to whisper and tell him things. And towards the end of that, about five or more minutes, I motioned to

---

[4] Jeffrey testified their family intended to go to the Friday night school carnival and then head to an out-of-state amusement park for the weekend.

> say, hey, it's time for us to go. And she said—and she told him, I
> know you can do this. You are stronger than you think.

When Jeffrey and N.J. returned home, the child was angry and went to the basement, found an arrow, and indicated he was going to stab himself. Jeffrey and Jen took N.J. to the emergency room to be evaluated; the child was treated and released, and they continued with the weekend plan.

At trial, Jeffrey addressed other concerns he has faced with Sommer. One related to how Sommer handles telephone calls with the child. Sommer requests that N.J. receive her telephone calls in the privacy of the child's bedroom. If a call comes when Jeffrey and the child are not at home, Sommer accuses Jeffrey of depriving her the ability to have a quality conversation with N.J. Jeffrey testified about a particular call he overheard. In May 2020, Sommer requested N.J. fly to Virginia for a three-day weekend. Jeffrey told Sommer he was uncomfortable with N.J. flying during the pandemic. In a call with his mother, N.J. also expressed his discomfort about flying on an airplane because of the COVID-19 virus. During the call, Jeffrey testified he heard Sommer yelling at N.J. that it was Jeffrey's idea to keep him from flying, not the child's idea. Jeffrey observed N.J. lying in a fetal position during the call. At that point, Jeffrey took the phone outside, waited for Sommer to stop yelling, and said "[I]s that right, you stupid bitch?"

Shortly before the August trial, Jeffrey applied for an emergency order to retrieve N.J. from summer visitation with his mother.[5] After dropping the child off for visitation on June 6; he later learned from Sommer's husband that the police

---

[5] On July 14, 2020, Jeffrey filed to immediately return N.J. to Iowa and asked for future visitation to be supervised.

were called on June 7 because the husband and Sommer had an altercation. The Virginia police report detailed that Sommer, in an intoxicated state, tried to push her husband down the stairs. The report noted the two were arguing over Sommer's refusal to give up alcohol. Two guns in the home were surrendered to the police. Yet Sommer omitted these details and only told Jeffrey on last minute notice that she and N.J. would spend time with her relatives in Connecticut.[6] In reality, an order required she leave the Virginia home.

Later in the summer, Sommer moved back to Virginia and lived with N.J.[7] in a women's shelter. While Sommer never told Jeffrey about the situation, he learned from N.J. that "he was living at a [bed and breakfast]—where people go after having hard times and there were counselors there." Jeffrey tried to get information and offered to pick up the child, but she said no and that N.J. was having the "best time." Sommer sent a text to Jeffrey that said do not communicate with Steve, her husband, especially about N.J. After obtaining an emergency order to retrieve N.J., Jeffrey overheard Sommer tell N.J. that Steve was abusive and she could no longer live in the Virginia house. An exhibit at trial referenced Sommer contacting authorities in mid-June to report she was scared to return home due to threats made by her husband. In early August, Steve had procured a protective order against Sommer, requiring the parties to exchange custody of

---

[6] A June 21 email from Sommer to Jeffrey informed him that Steve and Sommer were separating and she and N.J. would be summering in Connecticut at her parent's home.

[7] A report from the shelter's director of therapeutic services noted N.J. lived there from July 3 until July 17.

their child at the police station and for both the "mother and father [to] begin a substance abuse program immediately as well as individual counseling."

At trial, Sommer testified that she was then living in the home with Steve and they attended counseling together. She offered counseling reports confirming no additional mental-health or substance-abuse treatment was required for her. Sommer addressed the daily notes she sends to N.J. as her method of helping him through "things" the two of them talk about, such as getting kicked off the school newspaper. In Sommer's view, the notes are not about Jen or Jeffrey and raise N.J.'s spirits. Sommer characterized her relationship with N.J. as very close. Evidence presented bolstered that position. For example, the child's pediatrician noted N.J. said "that life isn't worth living if he can't see his own mother." There was an audio tape played at trial where N.J. sang:

> You are the sweetest thing in the world. You are the greatest thing in my life. Your [sic] are the sweetest thing in my life. Do not want to lose you. Do not want to lose you. Do not do not want to lose you now even though you're in Virginia now. I've already lost you. I won't be back for days and I want to be back soon but I can't.

Yet, the counseling notes quote N.J. as wanting to split time with both parents.

After the incident at the emergency room, in November 2019, Sommer applied for a modification of custody asserting that N.J. suffered due to the separation from her. Jeffrey responded with a counterclaim for sole custody of N.J. and for a reduction in Sommer's visitation rights. Before trial, Sommer dismissed her application for modification. With the counterclaim issues before the court, on September 7, 2020, the district court ordered sole legal custody and physical care in Jeffrey and reduced the visitation schedule for Sommer. Sommer timely appealed.

## II. Standard of Review.

"Actions for the modification of a dissolution decree are tried in equity." *In re Marriage of Roberts*, 954 N.W.2d 757, 760 (Iowa Ct. App 2020). So we review the district court's decision de novo. *In re Marriage of Harris*, 877 N.W.2d 434, 440 (Iowa 2016). Thus, "[w]e review the record with fresh eyes but still give weight to the district court's credibility findings." *In re Marriage of Heiar*, 954 N.W.2d 464, 471 (Iowa Ct. App. 2020). Although trial occurred by electronic format given the COVID-19 public health emergency, the district court still had the best seat to make credibility findings. *See In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013) ("We give weight to the findings of the district court, particularly concerning the credibility of witnesses; however, those findings are not binding upon us."); *see also In re Marriage of Jensen*, No. 17-1849, 2018 WL 4361056, at *3 (Iowa Ct. App. Sept. 12, 2018) (noting the district court has the chance "to observe the demeanor" of the witnesses and "hear [their] testimony"). We will disturb the district court's ruling "only when there has been a failure to do equity." *In re Marriage of Okland*, 699 N.W.2d 260, 263 (Iowa 2005).

## III. Analysis.

### A. Motion to Strike Reply Brief.

We first address a procedural issue raised by Jeffrey. As a part of this appeal, Jeffrey moved to strike Sommer's reply brief. In the briefing, the parties quibble over post-trial events that are outside the record made in this case. Jeffrey posits that because Sommer "argues at length that Jeffrey brought up post-trial happenings in his brief" the reply brief should be struck. In a "you did it too" argument, Sommer argues "[h]aving been hoisted by his own petard, [Jeffrey] now

feels the remedy is to strike not his brief, but Sommer's." Sommer requests attorney fees for having to resist a motion she feels is unwarranted.

Our rules are clear. If the information is not part of our record on appeal, we are unable to consider it. *See* Iowa R. App. P. 6.801 ("Only the original documents and exhibits filed in the district court case from which the appeal is taken, the transcript of proceedings, if any, and a certified copy of the related docket and court calendar entries prepared by the clerk of the district court constitute the record on appeal."). Each party crossed that line, and these rule infractions are not a trivial matter. A party's disregard of the rules may lead to summary disposition of the appeal or waiver of an issue. *See Inghram v. Dairyland Mut. Ins. Co.*, 215 N.W.2d 239, 239-40 (Iowa 1974). But here, we disregard matters raised outside of the record and admonish counsel to follow our rules moving forward. *See In re Marriage of Keith*, 513 N.W.2d 769, 771 (Iowa Ct. App. 1994) ("We are limited to the record before us and any matters outside the record on appeal are disregarded.").

Because we will not consider any information not part of the record on appeal referenced by either party, we refuse to strike the reply brief or award attorney fees related to this issue.

**B. Change in Custody and Visitation.**

Jeffrey faces several hurdles. First, he must establish a material and substantial change in circumstances since the 2017 ruling by a preponderance of the evidence. And if successful there, Jeffrey must support the more restrictive custody arrangement crafted by the district court. This step requires clear and convincing evidence that joint custody is unreasonable and not in the child's best

interests to the extent that the legal custodial relationship between the child and parent should be severed. *See* Iowa Code § 598.41(2)(b) (2020). As to the reduction in Sommer's visitation, Jeffrey "must establish by a preponderance of the evidence that there has been a material change in circumstances since the decree and that the requested change in visitation is in the best interests of the child[ ]." *See In re Marriage of Salmon*, 519 N.W.2d 94, 95-96 (Iowa Ct. App. 1994).

### 1. Substantial Change in Circumstances.

In 2017, the district court modified the decree considering Sommer's short-notice move to Virginia. But even more significant, our court noted Sommer had persistently and maliciously interfered with Jeffrey's visitation and relationship with N.J. *See Jacobson*, 2018 WL 1633512, at *2. In 2017, the "central issue [was] the mother's attempt to marginalize the father in the child's life." *Id.* One could argue that with the 2017 custody change, Sommer's opportunity for interference would subside. To that end, Jeffrey's burden is to show a material and substantial change in circumstances, and that burden is a heavy one: "undergirding the fundamental policy that 'once custody of [a child] has been fixed it should be disturbed only for the most cogent reasons.'" *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015) (quoting *In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983)). In this modification case, our overriding consideration is the best interests of the child. *See* Iowa R. App. P. 6.904(3)(o).

In the 2020 modification ruling, the district court found a substantial change in circumstances based on Sommer's "stepped up" efforts to damage the relationship between N.J. and Jeffrey. On top of that behavior, the district court

addressed Sommer's altercation with her current husband and her failure to communicate the situation to Jeffrey, including her several day stay with N.J. in a women's shelter. While in our previous case we found Sommer's interference and the level of conflict between the parents sufficient to warrant a modification, the changes crafted there have not solved the concerns. *See Jacobson*, 2018 WL 1633512, at *2. And, she appears to have learned little from the previous rulings describing her offending behavior.[8] Recognizing the best interests of the child are our primary concern, we cannot tolerate Sommer's continuing pattern of behavior. *See In re Marriage of Rosenfeld*, 524 N.W.2d 212, 215 (Iowa Ct. App. 1994) ("We recognize there are situations where one parent will seek to put the other parent in an unfavorable light. Some cases are slight and to be expected in our less than perfect society. Some cases are serious and should not be tolerated."). Changing physical care from Sommer to Jeffrey failed to curb the mother's behaviors that directly related to the stress on N.J. It only made her more subtle in her approach. *See Harris*, 877 N.W.2d at 442 (finding district court's "implicit confidence" in the parents' ability to communicate under the court ordered joint physical care plan was misplaced). We have modified custody when "shared custody provisions . . .

---

[8] Even in the original dissolution of marriage proceedings, the district court offered:

> The court FINDS that both parents are caring and loving but their ability to make reasonable compromise regarding visitation is not particularly strong. Occasionally, SOMMER has used denial of visitation to punish JEFFREY and JEFFREY is demanding that SOMMER provide him with all the visitation he wants, regardless of the changing needs of their son. These issues are character flaws in both parents and will, if not curbed, result in much pain and suffering for [N.J.] throughout his life. The Court admonishes both parents to first consider the well-being of this child before their own comfort and needs.

incorporated into the decree have not evolved as envisioned by either of the parties or the court" or when the parents simply "cannot cooperate or communicate in dealing with their children." *In re Marriage of Walton*, 577 N.W.2d 869, 870 (Iowa Ct. App.1998).

Jeffrey established a material and substantial change in circumstances warranting a modification of the previous ruling.

*2. Sole Legal Custody Determination.*

Much of the behavior that brings us to this point relates back to the first modification case when our court wrote Sommer "exhibited an intense distrust of Jeffrey manifested in an overzealous and overbearing supervision of Jeffrey's visitation with the child." *Jacobson*, 2018 WL 1633512 at *3. Now from Virginia, Sommer exhibits many of those same attributes even though Jeffrey has physical care. Her messaging is subtle, but the intent is clear. The district court held here that "Sommer continually attempts to turn N.J. against his father. She tells him repeatedly that he will 'survive' living with his father. She makes derogatory comments about Jeff and his wife, Jen, to N.J. on a very frequent basis." Sommer argues that sending loving daily messages and gifts shows no evil intent and that contacting medical and dental providers directly fulfills her role as a joint legal custodian. True, the visitation schedule the district court criticized in this modification was a product of the last trip to court, as Sommer urges. Yet, the district court had the benefit of observing the parties and hearing the testimony in real time. *See In re Marriage of Ford*, 563 N.W.2d 629, 631 (Iowa 1997) ("In assessing a custody order, we give considerable weight to the judgment of the

district court, which has had the benefit of hearing and observing the parties first-hand.")

Even so, a change to sole custody is an extreme move. The factors to consider in determining whether joint or sole legal custody should be granted are:

> (a) Whether each parent would be a suitable custodian for the child.
> (b) Whether the psychological and emotional needs and development of the child will suffer due to a lack of active contact with and attention from both parents.
> (c) Whether the parents can communicate with each other regarding the child's needs.
> (d) Whether both parents have actively cared for the child before and since the separation.
> (e) Whether each parent can support the other's relationship with the child.
> (f) Whether the custody arrangement is in accord with the child's wishes or whether the child has strong opposition, taking into consideration the child's age and maturity.
> (g) Whether one or both parents agree or are opposed to joint custody.
> (h) The geographic proximity of the parents.

Iowa Code § 598.41(3)(a)-(h). Three key factors relate to this case: the psychological and emotional needs of N.J., the parent's ability to communicate about the child's needs, and their ability to support the other's relationship with the child.

The child's therapy records provide a bird's-eye view into the damaging effects of Sommer's inability to support Jeffrey's relationship with N.J. and the negative impact on the child. Most compelling, the child reported being unable to tell Sommer he liked being with his father. *See In re Marriage of Gensley*, 777 N.W.2d 705, 716 (Iowa Ct. App. 2009) (holding sole legal custody was warranted because father discouraged the children to think well of their mother to the point they would not acknowledge the mother in public when with the father). N.J.

expressed worry about Sommer's reactions. In February 2018, the child's therapist noted:

> Therapist has communicated with mom that if she has concerns to please call the proper authorities such as police or DHS. Taking session time to address mom's concerns is not helping [N.J.] progress and rather shows how enmeshment appears a concern between this mother and [N.J.]. For example, [N.J.] has shared mom will buy him a dog if he lives in Virginia. [N.J.] has told therapist he doesn't think his mom would be okay if he stays living in Iowa.
> . . . .
> . . . It is therapist's professional opinion that [N.J.] may be sharing exaggerated examples of dad's perceived deficits to reassure his mom of his loyalty to her.

As a further concern, the counselors noted the tension N.J. felt while the parents waited for the 2017 modification appeal to resolve. Yet, in Jeffrey's care, the child reported being happy and wanting to stay with him at least half time. N.J.'s stress heightened with fears about how his mother felt and if she could handle being away from him.

Although Sommer no longer had physical care, there remained an effort on her part to control the narrative that she was the preferred parent. The October 2019 weekend dispute rang of a competition where she wanted to assert her dominant role over Jeffrey and place the child directly in the middle to choose. The content of the notes and letters developed an undertone of unhappiness and sadness with life. Sommer's lack of insight into how her messaging and behaviors negatively impact this child weigh against her position on appeal. *See In re Marriage of Liebich*, 547 N.W.2d 844, 849 (Iowa Ct. App. 1996) (awarding sole legal custody to father after finding mother's behavior to be emotionally damaging to the child); s*ee also In re Marriage of Weidner*, 338 N.W.2d 351, 357 (Iowa 1983) (concluding the parents' mutual mistrust and dislike of one another "wreaked havoc

in the lives of the parents and, more importantly, the day-to-day lives of their children"). Jeffrey testified:

> Q. You can give the dates as much as you can, but have these kind of comments you're going to tell the Court about been happening consistently for three years, every year, all the time? A. Yeah, that's correct, similar statements to the items that you see in the exhibits there, like you're stronger than you know; and if you can just get by, get by; you'll be at your real home soon.
> Q. Does she also call you a liar and other things, tell him he's brave? A. Yeah, she tells [N.J.]that he's brave for being able to live at my home.

While these parents have communicated about the child, the cumulative effect of the messaging has created a toxic situation for the child warranting a change. *See In re Marriage of Ertmann*, 376 N.W.2d 918, 920 (Iowa Ct. App.1985) (concluding the parties' inability to communicate and cooperate must rise above the "usual acrimony that accompanies a divorce" "[t]o be significant enough to justify a denial of joint custody"). As our supreme court noted in *Harris*, "[i]f the modification ordered here does not achieve more mature parental communication and cooperation by *both* parents in furtherance of the best interests of the children, the remedy of sole legal custody remains an option in any future modification proceedings." 877 N.W.2d at 444. Here, we find "clear and convincing evidence . . . that joint custody is unreasonable and not in the best interest of the child to the extent that the legal custodial relationship between the child and a parent should be severed." *See* Iowa Code § 598.41(2)(b). We affirm the district court's award of sole legal custody to Jeffrey.

### *3. Visitation Changes.*

After hearing the testimony, the district court determined the best interests of the child required Sommer's visitation be reduced. Generally, it is in the child's

best interests to have maximum continuous physical and emotional contact with both parents. *See In re Marriage of Jerome*, 378 N.W.2d 302, 305 (Iowa Ct. App. 1985). Requiring all visitation to occur in the Quad Cities, except for the summer visitation or by agreement of the parents, the modified schedule[9] gave Sommer the following scheduled visitations: one weekend per month in the Quad City area from Friday after school until Sunday at 8:00 p.m.; six weeks in the summer, not to include the week after or before the school term; every Thanksgiving break; alternating the Christmas holiday with Sommer receiving Christmas day in even years; and every spring break. The modification order also provided that if Jeffrey agrees, he will arrange for roundtrip flights for N.J. to visit Sommer. The flights must allow N.J. to be returned to the Quad Cities no later than 8:00 p.m., and outgoing flights will be planned to ensure N.J. does not have to leave Jeffrey's residence before 6:00 a.m. Additionally, Jeffrey would be responsible to pay for these flights. The modification also limited Sommer's phone contact with N.J. to three times per week. *See Salmon*, 519 N.W.2d at 95–96 (noting courts require "much less extensive change in circumstances" to modify visitation than is required to modify custody). In determining the appropriate amount of visitation, the district court found it troubling that ten year old N.J. was required to fly alone from Iowa to Virginia for three-day weekends many times each year. There was some support in the counseling notes that N.J. was weary with the schedule and did not like flying alone so often. From the viewpoint of the child and from our vantage point, the

---

[9] The district court ordered that none of the visitation would occur unless Sommer confirmed undergoing a mental-health and substance-abuse evaluation and treatment within ninety days after the order,.

new schedule offers a more stable and less stressful experience with each parent. *See Gensley*, 777 N.W.2d at 716 (finding an award of sole legal custody ensures one parent makes the decisions, fostering a more stable atmosphere for the children in some circumstances).

Similar to *Walton*, we hope the change in visitation fosters a better relationship for N.J. with both parents. *See* 577 N.W.2d at 871 (modifying physical care to the mother and restricting the father's visitation schedule by making it less flexible to address cooperation concerns). In the end, these parents might take a lesson from *Walton*:

> The parties' complaints that the other interferes with their relationship with the children will be remedied, somewhat, by making Jason's visitation schedule less flexible. However, government cannot micro-manage peoples' lives. Kari and Jason have allowed their bitterness toward each other to interfere with the well-being of their children. The court cannot order an awakening by the parties that fully supporting [the children's] relationship with the other parent is what their children need. This is something Kari and Jason must do on their own.

*Id.* We affirm the visitation provisions of the district court ruling.

**C. Attorney Fees.**

Sommer requests attorney fees on appeal. We deny that request. In deciding whether to award appellate attorney fees "we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the trial court's decision on appeal." *In re Marriage of Ask*, 551 N.W.2d 643, 646 (Iowa 1996). Sommer did not prevail so she is not entitled to appellate fees.

**IV. Conclusion.**

For all the reasons outlined above, we affirm the district court's ruling in total.

**AFFIRMED.**