# IN THE COURT OF APPEALS OF IOWA

No. 23-1563
Filed January 9, 2025

**MATHIAS R. LIBBY,**
    Plaintiff-Appellant,

**vs.**

**REBECCA N. BURGETT,**
    Defendant-Appellee.

_____

Appeal from the Iowa District Court for Linn County, David M. Cox, Judge.

A father appeals the district court's denial of his petition for modification.

**AFFIRMED AS MODIFIED.**

Christopher J. Foster of Foster Law Office, Iowa City, for appellant.

Alexander S. Momany of Howes Law Firm P.C., Cedar Rapids, for appellee.

Considered by Tabor, C.J., and Ahlers and Sandy, JJ.

**SANDY, Judge.**

B.B. is the daughter of Mathias "Matt" Libby and Rebecca Burgett. Matt appeals from a district court order denying his request for modification of B.B.'s physical care and his visitation schedule. Specifically, he argues the district court erred in denying his request for joint physical care and a minor alteration to the holiday visitation schedule outlined in the original custody decree. Additionally, he argues the district court erred in awarding Rebecca attorney fees.

After our review of the record, we affirm the district court's denial of Matt's petition for modification concerning his requests for joint physical care and an alteration to the holiday visitation schedule. However, we conclude the district court erred in awarding Rebecca attorney fees.

## I. Background Facts and Proceedings Facts

B.B. was born to Matt and Rebecca in 2018. Matt and Rebecca were never married. Shortly after their relationship ended, Matt filed a petition to establish custody of B.B. The parties entered into a stipulation agreement to resolve their custody dispute. The agreement provided that the parties would have joint legal custody of B.B. but physical care would be placed with Rebecca. Matt was granted liberal visitation.

Under the visitation schedule outlined in the agreement, Matt was to have one visit per week with B.B. from 5 p.m. to 9 p.m. Additionally, Matt would have B.B. every other weekend. The agreement also provided that Matt would pay Rebecca $613.12 per month in child support and Rebecca would be allowed to claim B.B. as a dependent for income tax purposes. The district court approved

the stipulation and incorporated it in its February 2020 decree. At the time the decree was issued, Matt lived in Iowa City and Rebecca lived in Milan, Illinois.

The parties did not operate under the custodial arrangement for very long before issues started to emerge. Shortly after Matt's relationship with Rebecca ended in 2018, he began dating his current wife, Ashley. Matt and Ashley married in 2022, and they recently welcomed a young son into the world. The record reveals Ashley and Rebecca do not get along. Over the years, Ashley and Rebecca have engaged in verbal confrontations and petty name-calling. Some of this has occurred in front of B.B. At one point, Ashley and Rebecca did not speak to each other for nearly two years.

According to Matt and Ashley, Rebecca frequently withheld visits with B.B. due to her dislike of Ashley.[1] Rebecca denied withholding visits, but she did admit to threatening to withhold them because she was not comfortable with Matt bringing Ashley to drop offs of B.B. According to Rebecca her issues with Ashley stem from her belief that Ashley improperly interjects into her and Matt's coparenting relationship. Matt filed a petition for modification in June 2021, asserting his relationship with Ashley led to visits being denied and "significant tension" with Rebecca.

While the petition for modification was pending, both Matt and Rebecca moved to Cedar Rapids in 2022. They currently live less than four miles apart from one another. The record shows Matt and Rebecca's coparenting relationship has

---

[1] Matt and Ashley's testimony at the modification trial differed concerning how many visits Rebecca allegedly withheld. According to Matt, Rebecca withheld visits forty-one times. However, Ashley testified twelve visits were withheld. Rebecca claims only one visit was withheld.

had various ups and downs since the filing of the petition for modification. Matt described his coparenting relationship with Rebecca as a "roller coaster ride." As he put it, "[s]ometimes we can talk openly about [B.B.], make great decisions about [her]. Other days it's standoffish. It's hard to tell when good days and bad days are." But by early 2023, Matt claims the relationship between him, Ashley, and Rebecca had greatly improved.

Ashley also noticed a dramatic improvement in her relationship with Rebecca in early 2023. As she testified at the modification trial:

> And then recently we were really great, things were awesome. We were like best friends. We texted all day, sent pictures back and forth to each other all the time. We went out to eat with Matt and [B.B.] and Rebecca. We had a mother/daughter date for nails, went shopping, got lunch together, which was asked upon Rebecca. Rebecca invited me to a Mother's Day event at Fleet Farm where we planted flowers together. We bought each other Mother's Day gifts. She got me a matching mother t-shirt for tee-ball. I mean, it was great. It was really nice being able to—everyone being so nice to each other. You could definitely tell [B.B.] enjoyed having all of the people she loves being cordial and friendly to each other.

Things even improved to the point of Matt and Rebecca agreeing to implement a joint physical care schedule during the summer of 2023. Under their agreement, care for B.B. alternated weekly. But after a few weeks, Rebecca canceled this arrangement because she noticed behavioral issues with B.B. after she returned from Matt's care. According to her, B.B. would frequently "meltdown" and have emotional outbursts. Additionally, she would not answer Rebecca's questions about what she did while at Matt's house. After discussing these issues with Matt, Rebecca decided to take B.B. to therapy.

Two other events during the summer of 2023 contributed to the end of the détente in the relationship between Matt, Rebecca, and Ashley. During a dance

recital for B.B., Rebecca and Ashley got into an argument over B.B. taking pictures with Ashley's family. Ashley alleges Rebecca "came up out of nowhere" and "ripped" B.B. away from her and her family. Feeling "stressed about having to go between her parents," B.B. had a "meltdown" backstage at the dance recital and refused to perform. Caitlyn Wang—a friend of Rebecca's—tried to calm B.B. down. But she was unsuccessful, and B.B. refused to perform at the recital.

In June, Rebecca and Ashley again had a confrontation over B.B. at a tee-ball game. After the game, Matt and Ashley took pictures with B.B. with members of Ashley's family. Rebecca grew frustrated with how long the pictures took because she had plans to take B.B. out for a snack with one of her teammates. Rebecca went up to Ashley and said, "[g]ive me my child, I'm trying to leave." At this moment, B.B. was in the arms of Ashley's mother. Ashley's mom, while holding B.B., shoved Rebecca. Rebecca responded by reaching for B.B., which resulted in a "tug-of-war" over the child. During the midst of this heated confrontation, Ashley and her mother called Rebecca a "bitch" and "psycho." Ashley also repeatedly said Rebecca was a bad mother. While this was happening, Matt was "standing back, watching and smiling."

The modification trial was held in August 2023. During her testimony, Rebecca provided additional details about her coparenting relationship with Matt. Rebecca testified she has always been B.B.'s primary caretaker. She has been responsible for scheduling B.B.'s medical appointments, transporting her to and from school, and signing her up for extracurricular activities. Additionally, she stated she and Matt cannot communicate on routine matters affecting B.B. For instance, Rebecca testified she and Matt have never discussed appropriate

discipline or bedtimes for their daughter. She also expressed frustration over Matt's lack of communication. According to her, Matt has twice taken B.B. out of state—once going as far as Las Vegas—without telling her.

During his testimony, Matt disagreed with Rebecca's characterization of their coparenting relationship. Although he described their coparenting relationship as a "roller coaster ride," he expressed his belief that he and Rebecca could peacefully coparent B.B. because they had "previously done it in the past." Additionally, he clarified during his testimony that he wanted to alter the holiday visitation schedule outlined in the original custody decree. Matt requested that the district court order the parties to rotate visitation annually on Halloween, Christmas Day, and B.B.'s birthday. He also requested that the district court reduce his child support payments and order the parties to alternate claiming the child dependency tax exemption.

The district court issued its ruling on the petition for modification shortly afterward. The district court denied Matt's request for joint physical care, finding that such a custodial arrangement was not in B.B.'s best interests. Similarly, the district court denied Matt's request to alter the holiday visitation schedule due to its belief that such a change would not be not in the child's best interests. The district court lowered Matt's child support payments to $492.89 per month, but denied his request to alternate claiming the child dependency tax exemption. Finally, the district court ordered Matt to pay $5,000 of Rebecca's attorney fees. This appeal followed.

## II. Standard of Review

"Because an action to modify a custody decree is heard in equity, our review is de novo." *Ticknor v. Harms*, No. 12-2299, 2013 WL 4012036, at *1 (Iowa Ct. App. Aug. 7, 2013). "Though we make our own findings of fact, we give weight to the district court's findings," especially those concerning the credibility of witnesses. *In re Marriage of Harris*, 877 N.W.2d 434, 440 (Iowa 2016).

Our review of a district court's award of trial attorney fees is for an abuse of discretion. *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006).

## III. Analysis

### A. Joint Physical Care[2]

"[O]nce custody has been fixed it should be disturbed for only the most cogent reasons." *In re Marriage of Brown*, 778 N.W.2d 47, 52 (Iowa Ct. App. 2009). Therefore, a party seeking modification of a child's physical care bears a "heavy burden." *In re Marriage of Thielges*, 623 N.W.2d 232, 235 (Iowa Ct. App. 2000). "When, as here, a parent is requesting a change from the other parent's physical care to their joint physical care, the requesting parent must show (1) a substantial change in circumstances occurred that necessitates the change and (2) joint physical care is in the child's best interests." *In re Marriage of Rigdon*, No. 22-1147, 2023 WL 4530133, at *3 (Iowa Ct. App. July 13, 2023) (citation omitted).

---

[2] Matt makes two arguments that are premised on his belief that the district court incorrectly declined to order joint physical care. He argues the district court should have ordered Rebecca to pay child support and ordered the parties to alternate claiming the child dependency tax exemption. But because we find the district court did not err in finding joint physical care, we do not address these arguments further.

In determining the best interests of the child, we consider the factors outlined in Iowa Code section 598.41(3) (2023). *Moses v. Rosol*, No. 18-0791, 2019 WL 2145709, at *3 (Iowa Ct. App. May 15, 2019). We consider these factors regardless of whether the parents were married or never married. *See* Iowa Code § 600B.40(2) ("In determining the visitation or custody arrangements of a child born out of wedlock . . . section 548.41 shall apply to the determination."). Typically, whether joint physical care is proper will turn on "four key considerations: (1) stability and continuity of caregiving; (2) the ability of the [parents] to communicate and show mutual respect; (3) the degree of conflict between the parents; and (4) the degree to which parents are in general agreement about their approach to daily matters." *In re Marriage of Geary*, No. 10-1964, 2011 WL 2112479, at *3 (Iowa Ct. App. May 25, 2011) (alteration in original) (summarizing factors established in *In re Marriage of Hansen*, 733 N.W.2d 683, 696–99 (Iowa 2007)).

Because both parties seemingly are in agreement that Rebecca's move from Milan, Illinois to Cedar Rapids constituted a substantial change in circumstances, we choose to focus our analysis on whether the district court correctly determined joint physical care is not in the child's best interests.[3] On appeal, Matt contends the district court erred in applying the *Hansen* factors and the weight given to them. We disagree.

Beginning with the first *Hansen* factor, the district court explicitly found that Rebecca "has been the historical primary care parent." Accordingly, the district

---

[3] We note Rebecca does not argue that her move to Cedar Rapids was not a substantial change in circumstances.

court found this factor weighed against joint physical care. Matt does not argue the fact that Rebecca has acted as the primary caregiver. Instead, he claims the district court should have given this factor less weight because Rebecca has only been the primary caregiver for the child for five years. Additionally, he claims this factor should have been given less weight because he and Rebecca "lived approximately one and a half hours apart during that time."

But we find the district court properly weighed this factor and determined it cuts against joint physical care. Our case law has placed a great emphasis on the role of historical primary caregivers due to the recognition of the importance of such a role to a child's development. *See In re Marriage of Wilson*, 532 N.W.2d 493, 495 (Iowa Ct. App. 1995) ("The role of primary caretaker is, however, critical in the development of children, and careful consideration is given in custody disputes to allowing children to remain with the parent who has been the primary caregiver."). Furthermore, successful primary caretaking is a strong predictor of the care a child will receive in the future. *See Hansen*, 733 N.W.2d at 697 ("[T]he successful caregiving by one [parent] in the past is a strong predictor that future care of the children will be of the same quality."). We are not convinced Rebecca's excellent record of caregiving is somehow diminished by the fact B.B. has only been alive for five years. Additionally, Matt's argument on this point is undermined by the fact that he stipulated to Rebecca having physical care in the original decree.

Moving onto the second *Hansen* factor, the district court found the "parties have not shown the ability to communicate and show mutual respect." Thus, the district court found this factor weighed against physical care. Matt argues the

district court erred because, "despite the problems that the parties have had in communicating with each other, they have demonstrated the ability to communicate and show mutual respect toward each other."

Again, we disagree with Matt on this point. The record amply demonstrates Matt and Rebecca struggle to communicate and show mutual respect to each other. Perhaps the most striking example of this was when B.B. was put in a literal "tug-of-war" at one of her tee-ball games due to a lack of communication. Such behavior goes beyond the typical breakdown in communication in marriage and child custody cases. While many of the communication issues are exacerbated by the hostility between Ashley and Rebecca, this does not change our analysis. *In re Marriage of Rosenfeld*, 524 N.W.2d 212, 215 (Iowa Ct. App. 1994) (finding physical care was properly placed with the child's mother in part because of the discord between the mother and the father's new spouse).

The third *Hansen* factor considers the degree of conflict between the parents. The district found the degree of conflict between Matt and Rebecca "is currently high." Thus, it found this factor weighed against an award of joint physical care. Matt similarly contends this factor was given too much weight by the district court because the parties have gotten along well for the benefit of their child in the past.

But we agree with the district court that this factor weighs against joint physical care. The record evidence conclusively shows the degree conflict of between Matt and Rebecca has negatively impacted B.B. This is evidenced by B.B. having a "meltdown" at her dance recital after her parents got into a heated argument. The child was overwhelmed to the point she refused to dance at her

recital because of the parental drama that occurred beforehand. The parties' quarrels have caused B.B. unnecessary anxiety and stress. Due to this history, we cannot conclude joint physical care is appropriate. *See In re Marriage of Enke*, No. 22-1329, 2023 WL 2906244, at *6 (Iowa Ct. App. Apr. 12, 2023) (finding joint physical care was not appropriate because the degree of conflict between the parents negatively affected the child).

Finally, as for the fourth *Hansen* factor, the district court noted the parties "do not really discuss daily issues such as bed times, bed time routines, and discipline." However, the district court noted the parties had discussed therapy for B.B. and had generally agreed on her extracurricular activities. Thus, the district court found this factor to be neutral. Matt asserts this factor should have been weighed in favor of joint physical care because he believes he and Rebecca "agree on matters relevant to the day-to-day care of their child."

We cannot conclude the district court erred in finding this factor did "not support nor weigh against joint physical care." As Rebecca testified at the modification trial, she and Matt do not really discuss daily matters related to child rearing. However, there is some evidence the parties have been able to discuss some important matters—such as therapy—for their child. Thus, we believe the district court correctly found this factor to be neutral as to joint physical care.

After considering these factors, we find the district court properly determined joint physical care was not appropriate in this case.[4]

---

[4] We note the district court relied on two other factors to determine joint physical care was not appropriate. The district court also found joint physical care was not appropriate because it would likely require more communication between Ashley and Rebecca. Given the acrimonious history between Ashley and Rebecca, we

**B. Holiday Visitation**[5]

"The burden upon the petitioner in a modification of visitation rights differs from the burden upon him or her in a modification of custody." *Nicolou v. Clements*, 516 N.W.2d 905, 906 (Iowa Ct. App. 1994). "[A]s to modification of visitation rights as compared to child custody changes the general rule is that a much less extensive change of circumstances need be shown in visitation right cases." *Donovan v. Donovan*, 212 N.W.2d 451, 453 (Iowa 1973). It must also be shown that the requested change in visitation is in the best interests of the children. *In re Marriage of Salmon*, 519 N.W.2d 94, 95–96 (Iowa Ct. App. 1994).

Matt argues the district court erred by denying his request to modify the visitation schedule to alternate visitation on Christmas Day. He believes the district court incorrectly focused on Rebecca's testimony that she is only guaranteed

---

cannot conclude the district court erred in finding this weighed against joint physical care. Second, the district court found the current physical care arrangement provided B.B. sufficient opportunity to bond with her half-sibling. Sibling bonds are a relevant consideration for determining the best interests of the child. *See Cobb v. Eiler*, No. 21-1044, 2022 WL 1100224, at *3 (Iowa Ct. App. 2022) (noting sibling bonds are important to the best interests analysis). But we agree with the district court that the current schedule outlined by the original decree gives adequate opportunity for B.B. to form a bond with her half-brother.

[5] We note the district court's order did not address Matt's request regarding visitation on Halloween and B.B.'s birthday. Instead, the district court's order focused solely on Matt's request concerning Christmas Day. When an issue is raised in the district court but not ruled on, the party raising the issue must file a motion to request a ruling on the issue not decided to preserve error. *See Meier v. Senecaut*, 641 N.W.2d 532, 539 (Iowa 2002) (concluding a party did not preserve error on an issue raised but not decided by the district court because the party never filed a motion to enlarge and reconsider). Here, Matt filed a motion to enlarge and reconsider, but this motion did not request a ruling on the visitation schedule with respect to Halloween and B.B.'s birthday. Thus, we conclude he has not preserved error on these issues. Accordingly, our analysis on the issue of the holiday visitation schedule focuses only on his argument related to Christmas Day.

Christmas Day off during the holiday season. Matt believes this was improper because Rebecca admitted she has previously worked on Christmas Day. Thus, he believes the district court erred in not altering the holiday visitation schedule with respect to Christmas Day. We disagree.

Although Rebecca contends Matt did not establish a substantial change in circumstances sufficient to justify modifying the holiday visitation schedule, we find he has met his burden on this issue. For purposes of modifying a visitation schedule, we conclude Rebecca's move from out-of-state to Cedar Rapids, which resulted in her living less than four miles from Matt, constituted a substantial change in circumstances. *See Rigdon*, 2023 WL 4530133, at *3 (concluding a mother's move, which resulted in her living just minutes apart from the father, was a substantial change in circumstances).

However, we cannot conclude Matt's requested modification to the holiday schedule is in the best interests of B.B. As Rebecca testified at trial, she is only guaranteed to have Christmas Day off during the holiday season. While Matt is correct that Rebecca worked on Christmas Day in 2021, from her testimony, it is clear that in 2021 she was working for a different employer. Rebecca is currently employed as a pharmacist at a Hy-Vee in Cedar Rapids. Moreover, we note under the current holiday visitation schedule, Matt has B.B. from December 22 to Christmas Eve. Given Rebecca's current work schedule around the holiday season and the importance of children spending time with each of their parents during that time of year, we find the district court properly declined to modify the holiday visitation schedule. We cannot conclude the district court failed to do equity. *See In re Marriage of Walters*, 575 N.W.2d 739, 741 (Iowa 1998) (noting

district court rulings concerning child custody modifications should only be disturbed if there is a failure to do equity).

### C. Trial Attorney Fees

Matt also contends the district court erred in ordering him to pay $5,000 of Rebecca's attorney fees. He claims the district court abused its discretion by not considering his financial ability to pay such fees.

The district court "may award the prevailing party reasonable attorney fees." Iowa Code § 600B.26. In considering whether to award attorney fees in a modification action, the district court should consider the "respective abilities of the parties to pay." *Christy v. Lenz*, 878 N.W.2d 461, 469 (Iowa Ct. App. 2016) (citation omitted). However, the district court may also consider whether the party resisting modification was successful. *In re Marriage of Michael*, 839 N.W.2d 630, 639 (Iowa 2013).

At the time of trial, Matt earned approximately $63,440 per year. Conversely, Rebecca earned $117,520 per year. This amounts to a $54,080 discrepancy in income between the parties. In deciding to award Rebecca attorney fees, the district court noted both parties prevailed on some issues at trial. However, it justified its award by explaining that it denied Matt's requests to "modify the care schedule which were the major issues at trial." Given that the district court did not take into account the wide disparity in income of the parties, we find it committed an abuse of discretion.

Accordingly, we modify this portion of the district court's order to vacate the award of trial attorney fees.

### D. Appellate Attorney Fees

Finally, Rebecca requests that we award her appellate attorney fees. "Appellate attorney fees are not a matter of right, but rather rest in this court's sound discretion." *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005); *see also Worth v. Geinitz*, No. 23-1080, 2024 WL 2316657, at *3 (Iowa Ct. App. May 22, 2024) ("The attorney fees permitted under section 600B.26 include appellate attorney fees."). In considering whether to award such fees we consider the needs of the party seeking the award, the financial ability of the other party to pay, and the merits of the appeal. *Id.*

Given both parties prevailed on some issues on appeal, we believe they should each pay their own appellate attorney fees. However, we tax eighty percent of costs on appeal to Matthew, with the remaining twenty percent taxed to Rebecca.

### IV. Conclusion

In sum, we affirm the district court's order denying Matt's petition for modification with respect to his requests for joint physical care and an alteration to the holiday visitation schedule. However, we vacate the portion of the district court's order awarding Rebecca $5,000 in attorney fees. Lastly, we decline Rebecca's request for appellate attorney fees.

**AFFIRMED AS MODIFIED.**