# IN THE COURT OF APPEALS OF IOWA

———————————

No. 25-0403
Filed March 11, 2026

———————————

**In re the Marriage of Christy R. Taylor and Colten L. Taylor**

Upon the Petition of
**Christy R. Taylor, n/k/a Christy R. Black,**
Petitioner–Appellee/Cross-Appellant,

And Concerning
**Colten L. Taylor,**
Respondent–Appellant/Cross-Appellee.

———————————

Appeal from the Iowa District Court for Wapello County,
The Honorable Crystal S. Cronk, Judge.

———————————

**AFFIRMED ON APPEAL AND REVERSED ON CROSS-APPEAL**

———————————

Colton L. Taylor, Eldon, self-represented appellant/cross-appellee, and
R.E. Breckenridge (until withdrawal) of Breckenridge Law, P.C., Ottumwa,
attorney for appellant/cross-appellee.
Heather M. Simplot of Harrison, Moreland, Webber,
Simplot & Sieren, P.C., Ottumwa, attorney for appellee/cross-appellant.

———————————

Considered without oral argument
by Tabor, C.J., and Badding and Sandy, JJ.
Opinion by Tabor, C.J.

1

**TABOR, Chief Judge.**

After over a decade of marriage, Colten Taylor and Christy Black divorced in November 2021. They have three children: daughters C.L.T, born in 2010, and C.J.T, born in 2013; and son, C.E.T., born in 2019. Following a modification trial that spanned several months, the district court eliminated Colten's parenting time with his daughters. He appeals. Christy cross-appeals, seeking sole legal custody of all three children. Reviewing the record de novo, we affirm Colten's appeal but reverse Christy's cross-appeal.

## I.    Facts and Prior Proceedings

In their stipulated decree, the parents agreed to joint legal custody of the children; Christy had physical care subject to Colten's parenting time. Under the parenting time schedule, Colten had the children every Wednesday from 4:30 p.m. until 8:00 p.m. and every other weekend beginning Friday at 6:00 p.m. and ending Sunday at 6:00 p.m. The parents also agreed to alternating holidays.

But executing the parenting plan did not go smoothly. In January 2021, the parties applied for and received a joint protective order restraining any personal contact for up to one year. So, as they began implementing the parenting plan, Christy mostly communicated through Colten's mother. Christy believed that after the protective order expired, they'd be able to effectively co-parent. But by February 2022, Colten filed a contempt action, claiming Christy violated their parenting schedule. Christy asserts that sometimes neither Colten nor his mother would show up to exchanges, and other times the girls did not want to visit Colten, despite Christy driving them to the meeting place. The district court continued the matter for ninety days with directions to the parents to follow the terms of their stipulation.

Although visitation was enforced after that, it was not without turmoil. The parents struggled with communication. When they divorced, Christy thought she and Colten were "on the same page" and could get along. But she testified, "[i]t's nothing that I presumed it would be." Christy testified that Colten doesn't trust her and thinks she plays "mind games" with him. He often ignored her texts, and when he did respond, it was "not unheard of" for his texts to devolve into long-winded missives containing bitter sentiments on their marriage. To improve communications, Christy created an electronic calendar listing their children's extracurricular activities and appointments. But Colten didn't use it, testifying that he used a paper calendar instead. And when Christy contemplated switching their youngest child to a different school, Colten's unhelpful responses made it challenging to reach a decision together.

Colten's inflexibility had a negative effect on the children. For example, when their middle child forgot her softball bag during an exchange, Christy tried to coordinate with Colten to drop it off. But he would not cooperate. Eventually, Christy dropped the bag off with Colten's sister-in-law, but Colten refused to accept the bag and fought with his brother. The police came, and C.L.T., the older sister, had to walk her father around the yard to calm him down. Colten did not bring C.J.T. to her softball tournament that weekend.

And that "softball bag incident" was not isolated. Christy, her mother, and C.L.T. all testified that Colten threatened to punish the children if they interacted with Christy or her family at their extracurricular events during his parenting time. And the record showed that Colten did not encourage the children's activities. In his testimony, Colten accused Christy of overbooking the children:

Since we have separated since 2020, my kids have been in, I don't, all kinds of stuff, church clubs, book clubs. She has thrown my kids in band, basketball, softball. I mean, where does it start and end? My kids have been bounced around, and I've noticed since the beginning of our separation, it was funny because a lot of that stuff landed on my parenting time too.

In fact, the children dropped out of activities, including sports and church groups, because the scheduling and participation caused friction with Colten. For instance, C.L.T. testified that she quit softball because her father would not take her to practice or games. Similarly, C.J.T. quit wrestling after her father "screamed and yelled at her and embarrassed her" in front of her friends on the team.

Colten also placed the children in the middle of his custody battle with Christy. He was vocal about his desire for shared care, offering to buy the children pets, dirtbikes, and ice cream, but only if they would tell Christy they wanted a fifty/fifty custody arrangement.

What's more, Colten's treatment of his daughters is concerning. C.L.T. testified that he called her a "whore" because she dressed or looked like her mother. He also restricted her use of technology during visits, making it difficult to finish her homework. And when C.L.T. brought schoolbooks instead, he took those. In that same vein, Colten often took away the girls' cell phones during visits. When the girls asked why, he forced them to stand with their arms up and their hands against a wall for thirty minutes. If their arms dropped, he restarted the time. According to Christy, "they were crying by the time it was done."

Their father's harsh treatment harmed the girls' mental health. C.L.T.'s therapist testified that the teenager's main stressors stemmed from her visits with Colten. C.L.T. is scared to visit her father and revealed during therapy that she "blacks out or freezes" when she is with him. In fact, C.L.T. had a panic attack before an exchange that landed her in the emergency room.

4

Similarly, C.J.T. didn't sleep well when she anticipated having to visit her father. On top of their disquieting experiences during Colten's parenting time, the girls recall that before their parents separated, they witnessed his domestic violence against Christy, which contributed to their fear.

As for their youngest child, C.E.T., the relationship between father and son is less strained. While C.E.T. has mentioned it's unfair he has to visit Colten while his sisters do not, C.E.T. has been less vocal in objecting to time with his father. But Christy and Colten still faced challenges coordinating C.E.T.'s activities. For example, the record showed that Colten would not agree to C.E.T. playing spring t-ball and swimming lessons because those activities interfered with his parenting time.

Because of the parents' tumultuous post-divorce relationship, Christy petitioned to modify the parenting schedule in September 2022. She sought to reduce Colten's parenting time. In his answer, Colten resisted and sought shared care. The court appointed an attorney to serve as the child and family reporter (CFR) to protect the children's interests.

In early January 2024, the court held a two-day hearing on these matters. That same month, C.L.T., through counsel, sought a temporary writ of injunction to suspend visitation. The court set it for trial and ordered suspension of visitation for C.L.T. until the matter could be heard. Christy asked the court to expand the writ to include the younger daughter. But based on the pleadings, it appears the court only suspended Colten's visitation with C.L.T. Still, testimony and the CFR reports reveal that neither girl has attended visitation with Colten since before January 2024.[1]

---

[1] Their absence wasn't for lack of trying by Christy, who testified to her efforts to facilitate visitation:

In February, the court ordered family therapy between Colten and C.L.T. The sessions got off to a rocky start. C.L.T. felt the therapist did not advocate for her, and she noted that Colten talked over her. But after C.L.T. conferred with the therapist one-on-one, she felt the therapist understood her viewpoint better, so she continued family therapy.

To Colten's credit, he began individual therapy while this case was pending. His therapist testified that she sees him biweekly to work on communication, parenting issues, and processing his feelings. He didn't miss any appointments. She reported: "To this therapist's knowledge with the information that has been provided, [Colten] is capable to provide for his children's physical needs, emotional wellness, and medical care." Likewise, in her April 2024 report, the CFR wrote: "Colten loves his children and wants to be involved in their lives."

That spring, three matters were pending: (1) contempt applications filed by both parties, (2) Christy's petition to modify the visitation schedule along with Colten's request for shared care, and (3) C.L.T.'s application for a temporary injunction on visitation. The court heard testimony on those matters for one day in April and two days in August 2024.

Part of the August evidence was an update on the continuing family therapy. C.L.T. did not believe that the sessions were repairing the father-daughter relationship. The CFR wrote, "[C.L.T.] reports that Colten has not changed any of his thinking and behaviors that would reassure her that she

---

I've done everything that I can possibly do, other than pick my kids up and put them in the vehicle against their will. I take them to every exchange. I have had them in therapy. I talk to them. I tell them they deserve a relationship with their dad. I go to the exchange. I tell them, "You have to get out. You have to go talk to him." . . . I ground them when they're not there. They don't get to play. They don't get to go to their friends' houses.

would be safe during visitation." At trial, Christy expanded her modification request to include sole legal custody.

After assessing the lack of improvement though family therapy, Colten's refusal to take accountability, and the girls' fragile mental health, the CFR endorsed Christy's request for sole legal custody. The CFR also favored suspending visitation. She believed that requiring C.L.T. and C.J.T. to resume visitation with Colten could cause their mental health to "deteriorate to the point that they would physically harm themselves." At trial, the CFR stressed that Colten needed to learn how to communicate with his daughters. She noted that he did not accept responsibility for their fraught relationship. Many of Colten's conversations with the CFR were "really geared about him voicing his concerns over the divorce and what Christy had done to the divorce and how he feels wronged from the divorce."

In January 2025, the court issued its ruling—rejecting the contempt applications, denying Colten's request for shared care, and granting Christy's request to modify the parenting time schedule. Under this order, Wednesday visitation was suspended for the two daughters "until such time as their therapist recommends such visits may safely occur." And the daughters' weekend visitation was amended to alternating weekends from 9:00 a.m. Saturday to 6:00 p.m. Sunday.

Following this order, Christy moved to reconsider. She urged the court to apply the therapist-approval requirement to Colten's weekend visitation, as well. She also asked the court to enlarge its ruling to grant her sole legal custody of all three children. In response, the court approved her visitation revision, stating that "C.L.T. and C.J.T. shall not be required to attend weekend visitation with Colten until such time as their therapist recommends such visits may safely occur." But the court denied her request for sole legal custody.

Colten also moved to reconsider. He argued the court improperly delegated its authority to modify visitation to the girls' therapist. In response, the court deleted its language placing discretion to reinstate visitation with the therapist. Instead, the court eliminated his parenting time:

> The Court recognizes that visits should not be suspended pending the determination of the therapist. The Court finds very credible testimony from [the] child of the safety concerns she feels when in Colten's care and the traumatic effect visitation has upon her. C.L.T. recalls the domestic violence within the home between parents. Both girls experience anxiety regarding Colten. The Court found that Colten was not credible in his explanation of how well his interactions with the daughters goes, he disregarded their experiences and he has not shown the ability to effectively parent the daughters. The Court found the testimony of [the therapist] credible in detailing the ramifications of the visits. The ongoing negative effect of these visitations is not in the best interest of C.L.T and C.J.T.

Colten appeals, arguing the court should not have ended his parenting time. Christy cross-appeals, seeking sole legal custody.

## II.    Analysis

Both the appeal and cross-appeal focus on what level of involvement by Colten serves the children's best interests. We must decide (1) whether the district court wrongly eliminated his parenting time with the two girls, and (2) whether the court should have granted Christy sole legal custody of all three children.

We review modifications of a dissolution decree de novo. *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015). Under that review, we reach our own findings of fact, but when considering witness credibility, we give weight to the district court's findings. *Id.* And the children's best interests are the "controlling consideration." *Id.* (citation omitted).

We start with the modification standards. First, for changes in custody:

> [T]he applying party must establish by a preponderance of evidence that conditions since the decree was entered have so materially and substantially changed that the children's best interests make it expedient to make the requested change. The changed circumstances must not have been contemplated by the court when the decree was entered, and they must be more or less permanent, not temporary. They must relate to the welfare of the children.

*In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983).

The standard for changing parenting time is less burdensome. To modify visitation, the petitioning parent "must establish by a preponderance of evidence that there has been a material change in circumstances since the decree and that the requested change in visitation is in the best interests of the children." *In re Marriage of Salmon*, 519 N.W.2d 94, 95–96 (Iowa Ct. App. 1994).

For both the appeal and cross-appeal, the record must reflect a change in circumstances—substantial or material.

### A. Eliminating Father's Parenting Time with Daughters

On Colten's appeal, he notes Christy's burden to show a material change in circumstances before visitation can be modified. But in his appellant's brief, he does not dispute that a change occurred. Likely because doing so would have contradicted his position at trial. In his answer to Christy's modification petition, Colten only denied that he was "responsible for any change in circumstances." He then urged that the award of physical care to Christy should be modified to shared care.

But even if Colten is contesting proof of that threshold element, we agree with the district court's determination. The court found "there has been a material and substantial change in circumstances for the parties since the 2021 decree. The parents' ability to communicate and effectively

co-parent has deteriorated significantly; the mental well-being of C.L.T. and C.J.T. has deteriorated, and the physical safety of C.L.T. is of concern."

Next, we must decide whether the district court's elimination of Colten's parenting time is in the best interests of his two daughters. Generally, liberal visitation is in children's best interests "unless direct physical harm or significant emotional harm to the child, other children, or a parent is likely to result from such contact." *In re Marriage of Rykhoek*, 525 N.W.2d 1, 4 (Iowa Ct. App. 1994) (citation omitted).

We find that eliminating Colten's parenting time is in the girls' best interests. On this record, the risk of significant emotional harm to C.L.T. and C.J.T. overcomes the general preference for liberal visitation.[2] This finding is supported by the CFR reports. And it is backed by credible trial testimony. For instance, Christy testified that leading up to Colten's parenting time, the children experienced visible anxiety and would often cry. During his parenting time, they were not permitted to communicate with their mother or her family members, so much that it impacted their attendance at their activities.

And while parental restrictions on children's use of electronics certainly may be reasonable, Colten's ban on his daughter's use of phones and computers during his parenting time was arbitrary and counterproductive. More troubling is his treatment of the girls, calling them

---

[2] Colten complains that the district court's ruling lumps together both sisters when "almost no testimony was presented with regard to the middle child, C.J.T." It's true that the eldest daughter took a more active role in the proceedings. And she received the brunt of Colten's harsh treatment. But his questionable parenting choices have affected both girls. Both are in therapy to work through the difficult family dynamics. And they both oppose visitation.

names, yelling at them in front of friends, and subjecting them to demeaning punishments.

For these reasons, we find the district court did not fail to do equity and agree that it is in the girls' best interests to terminate Colten's visitation. Should the circumstances change in the future, he is free to seek modification.

## B. Granting Mother's Request for Sole Legal Custody

In her cross-appeal, Christy maintains the district court should have awarded her sole legal custody of all three children. Colten contests error preservation on this issue, contending Christy did not seek sole legal custody until her motion to reconsider. But that contention is inaccurate. Christy did request sole legal custody during the trial. Colten's counsel cross examined her about that request.[3] And the district court ruled on her request for sole legal custody following her motion to reconsider. So we find that she preserved error. *See Lamasters v. State*, 821 N.W.2d 856, 864 (Iowa 2012) ("Where the trial court's ruling, as here, expressly acknowledges that an issue is before the court and then the ruling necessarily decides that issue, that is sufficient to preserve error.").

Moving to the merits, Colten asserts in his reply brief that "one has to question where Christy has met her burden of showing a substantial change of circumstances." But as noted above, we agree with the district court's finding that the parents' escalating acrimony since entry of the decree qualifies as a material and substantial change in circumstances. *See In re*

---

[3] Colten's counsel asked: "So you want sole legal custody so you won't have to justify your actions to anyone?" Christy responded: "No. that's not the reason whatsoever." She later explained that she couldn't think of an instance since the divorce when she and Colten "agreed civilly" the first time that they tried to reach an important decision about the children.

*Marriage of Harris*, 877 N.W.2d 434, 441 (Iowa 2016) (recognizing custody modification is appropriate when shared custody provisions have not "evolved as envisioned by either of the parties or the court" or when the parents "cannot cooperate or communicate in dealing with their children" (citation omitted)).

So we turn to the propriety of sole legal custody. Iowa's legislature and judiciary have adopted a policy favoring joint over sole legal custody. *See In re Marriage of Winnike*, 497 N.W.2d 170, 173 (Iowa Ct. App. 1992). Joint legal custody provides both parents with "legal custodial rights and responsibilities toward the child," including "equal participation in decisions affecting the child's legal status, medical care, education, extracurricular activities, and religious instruction." Iowa Code § 598.1(3) (2024). To overcome that statutory preference, courts must point to clear and convincing evidence that joint custody is unreasonable and not in the children's best interests. Iowa Code § 598.41(2)(b). The court's decision is guided by the factors in section 598.41(3).[4] When parents show they can set aside their differences for the children's sake, then Iowa courts generally maintain joint custody arrangements. *Harris*, 877 N.W.2d at 440.

---

[4] Those factors include "whether each parent would be a suitable custodian for the child[ren]"; "[w]hether the psychological and emotional needs and development of the child[ren] will suffer due to lack of active contact with and attention from both parents"; "[w]hether the parents can communicate with each other regarding the child[ren]'s needs"; "[w]hether both parents have actively cared for the child[ren] before and since the separation"; "[w]hether each parent can support the other parent's relationship with the child[ren]"; "[w]hether the custody arrangement is in accord with the child[ren]'s wishes or whether the child[ren] have strong opposition, taking into consideration the child[ren]'s age[s] and maturity"; "[w]hether one or both parents agree or are opposed to joint custody"; "[t]he geographic proximity of the parents"; "[w]hether the safety of the . . . children . . . will be jeopardized by the awarding joint custody"; and whether there is a history of domestic abuse. Iowa Code § 598.41(3).

But Colten has not demonstrated that he can let go of his grievances over the divorce for the sake of his children. He often laments issues dating back to the marriage, which complicates the parents' joint decision-making. His difficulty in communicating and cooperating with Christy has affected the children in their academics, extra-curricular activities, and mental health. As the CFR reported:

> Since the parties' separation, the animosity and communication has progressively worsened [rather] than improved for the better. What should be [] small disagreement[s] will morph into much larger situations that are not solution focused but rather punitive or point driven, which the oldest two children witness firsthand. [C.L.T.] and [C.J.T.] share they feel caught in the middle of the adult issues which has caused them trauma, nightmares, fear[], and other negative feelings . . . .

We agree with the CFR that Colten's animosity toward Christy prevents him from prioritizing the well-being of the children. To illustrate, according to his mother, Colten wanted to use the "softball bag incident" to file a contempt action against Christy. What's more, he rebukes Christy's efforts to improve the channels of communication and does not support her relationship with the children. Colten's lack of cooperation has made it hard for the parents to reach decisions about the children's education and extracurricular activities. We also place weight on the daughters' strong opposition to having Colten involved in their lives.

With an award of sole legal custody, Christy will be able to make those critical decisions without facing Colten's obstruction. Her sole-decision making authority will "result in a more stable atmosphere for the children to carry on with their daily lives." *See In re Marriage of Gensley*, 777 N.W.2d 705, 714 (Iowa Ct. App. 2009).

We affirm the district court's elimination of Colten's visitation and reverse the district court's denial of Christy's request for sole legal custody.

### C. Denying Mother's Request for Appellate Attorney Fees

Lastly, Christy requests appellate attorney fees. She does not specify an amount, nor does she provide an attorney's affidavit.

It is within our discretion whether to award attorney fees on appeal. *In re Marriage of Kisting*, 6 N.W.3d 326, 338 (Iowa Ct. App. 2024). In exercising that discretion, we focus on the parties' relative financial positions. *Id*. But we also consider the merits of the appeal and whether the requesting party was obliged to defend the district court's rulings. *Id*.

While Christy is the prevailing party in this action, the record shows that she and Colten have comparable incomes. So, on this record, we decline to award attorney fees.

**AFFIRMED ON APPEAL AND REVERSED ON CROSS-APPEAL.**